# Exhibit 1

# THE LOAN-OUT CORPORATION IN TAX PLANNING FOR ENTERTAINERS*

GEORGE G. SHORT†

Successful entertainers commonly furnish their personal services through a vehicle known as a "loan-out corporation." The effective use of a loan-out corporation can provide substantial tax benefits, but without proper planning and administration, tax and business problems may result which outweigh the potential advantages. This article will discuss the benefits and problems of using the loan-out corporation in an entertainer's tax plan.

## I
## THE LOAN-OUT CORPORATION

A true loan-out corporation provides one product to the public: the personal services of the particular entertainer. The corporation may also function in other capacities, such as providing production facilities, creating a produced film, or licensing or selling a published work. However for purposes of this article, it will be assumed that the loan-out corporation solely provides the personal services of an entertainer.

The loan-out arrangement involves two primary contractual relationships. First, the corporation enters into an employment agreement with the entertainer, who agrees to provide his personal services to the corporation in exchange for a fixed or contingent salary which, since earned in an employer-employee relationship,[1] will be subject to customary withholding and other employment taxes.[2] In order to assure the promoter, producer and others that they can obtain exclusive rights from the corporation, the employment agreement should require the entertainer to furnish his services within a particular medium exclusively to his loan-out corporation.

Second, once the corporation is assured of receiving the benefit of the entertainer's personal services within a particular medium, it will contract with promoters, producers and others to furnish (or loan) the services of the entertainer. This agreement will establish an independent contractor's relationship between

Copyright © 1982 by George G. Short

* The text of this article was submitted to the printer in final form in Spring 1982. Subsequently, on August 19, 1982, Congress passed major tax legislation, the Tax Equity and Fiscal Responsibility Act of 1982, H.R. 4961, 97th Cong., 2d Sess. (Aug. 19, 1982) [hereinafter cited as TEFRA]. TEFRA substantially modifies the Internal Revenue Code as it affects loan-out corporations and employee benefit plans. Unfortunately, TEFRA was drafted too late to be integrated into the text of this article, but it is discussed in the postscript, which *must* be read in order to understand the current state of the law.

† Practicing tax attorney, Los Angeles, California.

1. I.R.C. § 3401(c).
2. I.R.C. §§ 3401-3404.

the corporation and the producer or promoter, so the amounts payable will not be subject to withholding and other employment taxes customarily retained from payments made to employees.[3]

## II

## TAX BENEFITS OF A LOAN-OUT CORPORATION

An entertainer will employ a loan-out corporation principally to defer the recognition of income for tax purposes. Income deferral is important for entertainers because their career spans, particularly the periods of high demand and high earnings, may be very short, and the advantages provided by income averaging[4] may not adequately reduce the tax rate applicable to the entertainer's earnings. Income deferral and reduction of the tax rate can be accomplished by a variety of techniques.

### A. Fiscal Year Planning

A corporation is entitled to elect a fiscal year for tax purposes without regard to the taxable year of any of its shareholders.[5] The corporation may accomplish a one year deferral of income by selecting the appropriate fiscal year.

Consider the situation of Johnny Rayguns, a young actor who has just signed to appear in a motion picture for which he will be paid $25,000 per month, plus expenses, during the six months of filming from July 1 to December 31, 1982. If he executes the contract, performs his services, and receives his wages, he would recognize $150,000 of gross income during 1982, with taxes payable by April 15, 1983. If, however, he is an employee of J.R., Ltd. (which has a fiscal year ending January 31 and which furnishes his services to the producer), the corporation, not Johnny, will receive $25,000 per month, but might pay Johnny a $10,000 monthly salary from July 1 to December 31, with a cash bonus of $90,000 payable on January 15, 1983. The additional $90,000 would be included in Johnny's 1983 personal income, with resulting tax liability due by April 15, 1984. He will be required to pay tax on the $60,000 salary paid in 1982 by April 15, 1983. If the tax due in 1984 is $45,000, Johnny has improved his cash flow by $45,000 for one year, which is in effect an interest-free loan from the government. With interest rates at their current high levels, the benefit is obvious. Further, assuming inflation continues, $45,000 will be worth less and presumably easier to earn in 1984, but will still satisfy the entire tax liability.

Meanwhile, J.R., Ltd. will deduct the salary and bonus payments from its gross income as ordinary and necessary business expenses[6] for the fiscal year ending January 31, 1983 and should therefore recognize little or no taxable income. The

3. The cautious promoter or producer may require the loan-out corporation to provide indemnification against any tax or other civil liability which may result by the producer or promoter's failure to withhold employment taxes from the amounts paid to the corporation.

4. I.R.C. §§ 1301-1305.

5. *See* I.R.C. § 441(e).

6. I.R.C. § 162(a)(1).

same technique will be used each succeeding year to continually roll over the deferral.

B. Lower Corporate Tax Rates

Income tax rates imposed upon corporations are generally lower than those imposed upon individuals. Current corporate rates tax the first $25,000 of taxable income at 16 percent (15 percent for tax years beginning during or after 1983), the next $25,000 at 19 percent (18 percent during or after 1983), the next $25,000 at 30 percent, the next $25,000 at 40 percent, and any amounts above $100,000 are taxed at 46 percent.[7] The former rates were reduced by the Economic Recovery Tax Act of 1981 (ERTA). This compares favorably with the maximum tax rate of 50 percent[8] and, of course, the pre-ERTA 70 percent tax rate that was imposed on individuals' nonpersonal service income. However, the accumulation of taxable income by the corporation may not be desirable because of the accumulated earnings tax,[9] personal holding company tax[10] and constructive dividend problems which will be discussed later in this article.

C. Qualified Pension and Profit-Sharing Plans

Pension and profit-sharing plans which are qualified under section 401(a) of the Internal Revenue Code (the "Code") provide the greatest tax deferral benefit for an entertainer with a loan-out corporation. Qualified plans allow deferral of both recognition and receipt of income for tax purposes,[11] the tax-free accumulation of investment earnings within the qualified trust,[12] the opportunity for a tax-free distribution upon the participant's disability,[13] and the potential exclusion of death benefit proceeds from the participant's gross estate for federal estate tax purposes.[14] If properly implemented, qualified plans can accumulate and invest funds for the entertainer with significantly minimized tax consequences.

It should be noted first that an individual can establish either a Keogh plan (if he is self-employed) or an individual retirement account (if he is employed by someone else), both of which provide similar benefits. However, both Keogh plans and individual retirement accounts have substantial limitations imposed upon them, such as the amount that can be contributed in a year,[15] the identity of the individual who can act as trustee of the funds, and the types of investments that can be made.[16] While these limitations have been eased by ERTA, the benefits

7. I.R.C. § 11. The rate reductions were enacted by the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, 95 Stat. 172 (1981) [hereinafter cited as ERTA].
8. I.R.C. § 1. ERTA reduced the maximum marginal tax rate from 70 percent to 50 percent in 1982 and all subsequent tax years.
9. I.R.C. §§ 531-537.
10. I.R.C. §§ 541-547.
11. *See* I.R.C. §§ 404, 402(a)(1).
12. I.R..C. § 501(a).
13. I.R.C. § 105(d).
14. I.R.C. § 2039(c).
15. I.R.C. §§ 401(c), 404(e).
16. *See* I.R.C. § 401(d)(1). Since this provision requires corporate fiduciaries to be trustees of Keogh

available from these plans pale in contrast to the qualified plans that can be established by a corporation.

1. *Types of Qualified Plans.* Three types of qualified retirement plans fitting within two categories are most commonly used by loan-out corporations.

   *a. Defined contribution plans.* A defined contribution retirement plan[17] provides each participant with retirement benefits based solely on the employer's contributions, income, expenses, gains and losses attributable thereto, and forfeitures of participants' accounts in profit sharing plans which are allocated to the individual account maintained for remaining participants. A participant's retirement benefit is determined by the value of his individual account at retirement. The most common forms of defined contribution plans utilized by loan-out corporations are money purchase pension plans and profit-sharing plans, but sometimes target benefit pension plans are also effective.

   A money purchase pension plan requires the employer to make a stipulated annual contribution (*e.g.,* 10 percent of each participant's compensation) which is allocated among the plan's participants and retained in an individual account for each participant according to a formula stated in the plan. While the plan is in effect, each year's contribution is invested by the trustee, and at retirement the contributions and earnings accumulated in the participant's account provide the participant's retirement benefit. The annual contribution is a liability of the corporation and must be paid annually.[18]

   In a profit-sharing plan, a portion of the employer's current or accumulated profits may be contributed to the plan and allocated among the participants' accounts.[19] Profit-sharing plans and money purchase plans are similar in that the ultimate retirement benefits equal the total contributions, plus earnings, held in each participant's account. However they differ in several very important respects:

   (i) Money purchase plan contributions are not dependent upon profits, but profit-sharing plan contributions may *only* be made from current or accumulated profits.

   (ii) Money purchase plan contributions in the specified amount are required each year, but employer profit-sharing plan contributions are discretionary, although they must be substantial and recurring.

   (iii) Money purchase plan contributions are deductible by the employer up to 25 percent of all participants' total compensation for the year, and profit-sharing plan contributions are deductible only up to 15 percent of all participants' compensation.[20]

   (iv) Money purchase plan forfeitures which arise by the termination of employment by nonvested participants reduce future years' employer contribu-

---

plans, the investment alternatives are limited because of corporate fiduciaries' natural tendency to be more conservative in their approach to investing retirement plan assets.

17.   See the definitions of "individual account plan" or "defined contribution plan" set forth in section 3(34) of the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 (codified in scattered sections of 5, 18, 29, 31, and 42 U.S.C.) [hereinafter cited as ERISA].

18.   Treas. Reg. § 1.401(b)(1)(i) (1976).

19.   Treas. Reg. § 1.401(b)(1)(ii) (1976).

20.   I.R.C. §§ 404(a)(1), 404(a)(3).

tions, but profit-sharing plan forfeitures are reallocated among the remaining participants.

Loan-out corporations frequently use both a money purchase plan, with a fixed contribution equalling 10 percent of all participants' compensation, and a profit-sharing plan. This combination allows the corporation to contribute and deduct annually not less than 10 percent but as much as 25 percent of compensation, providing highly desirable flexibility.

*b. Defined benefit plans.* Defined benefit pension plans[21] provide definitely determinable benefits (*e.g.*, 50 percent of the participant's average annual compensation, payable annually for life) to participants at their normal retirement age, and the annual contributions are determined by the amount actuarially required to "fund" this benefit.

Each year, an actuary calculates the dollar value of the benefit for each individual participant, determines how much money must be in the plan's trust at the participant's normal retirement age to purchase an annuity which will provide that benefit, and then determines how much the employer must contribute to the plan that year to guarantee that this amount will be available. When making this calculation, the actuary takes into account certain assumptions, such as the projected annual investment growth of the fund, expected employee turnover, and the current age of the participant and his spouse. Thus, in a defined benefit plan the final retirement benefit determines the annual contributions, while in a defined contribution plan the annual contributions determine the final retirement benefit.

Under this method of determining the annual contribution, the annual contribution will be greater for the participant who enters the plan closer to his normal retirement age, whether it is because he is older or because the plan specifies a lower retirement age. The IRS now allows a normal retirement age of fifty-five,[22] and has approved numerous other plans providing much lower normal retirement ages provided the appropriate actuarial adjustments[23] are made.

The contributing employer is entitled to deduct the entire contribution to the defined benefit plan so long as it does not cause the plan to be overfunded.[24]

Title IV of ERISA requires employers with defined benefit plans to purchase plan termination insurance from the Pension Benefit Guaranty Corporation. However, plans of "performing artists" which do not at any time have more than twenty-five active participants are exempt from this requirement.[25]

A target benefit pension plan is a hybrid of the defined contribution and defined benefit plan. It is similar to a defined benefit plan in that the annual contribution is determined actuarially and the benefit is stated in a manner similar to a defined benefit plan. However, unlike defined benefit plans, investment earnings do not affect future contributions, and the limitations on contributions to defined contribution plans apply to target benefit plans. Target benefit plans lost

---

21. *See* ERISA, *supra* note 17, § 3(35).
22. Rev. Rul. 78-120, 1978-1 C.B. 117.
23. I.R.C. § 415(b)(2)(C).
24. I.R.C. § 404(a)(1).
25. ERISA, *supra* note 17, § 4021(b)(13).

their greatest value after enactment of the ERISA, which made them subject to the defined contribution limitations. However they are still useful in conjunction with a defined benefit plan to take full advantage of the "1.4 Rule," described later in this article, and to minimize the contributions for very young employees where the principal owner of the corporation is older.

*c. Limitations on contributions and benefits.* Code section 415 imposes limitations upon contributions that can be made to a defined contribution plan and benefits that can be paid from a defined benefit plan. In a defined contribution plan the employer contribution, forfeitures reallocated under a profit sharing plan, and a portion of any nondeductible employee contributions (which are allocated to the participant's account in a given year) cannot exceed the lesser of 25 percent of the participant's compensation for that year or for plan years commencing in 1982, $45,475.[26] This dollar limitation restricts the use of defined contribution plans for highly compensated entertainers.[27]

Benefits payable from defined benefit plans cannot exceed the lesser of 100 percent of the participant's average annual compensation during his highest paid consecutive five years of participation or, for actuarial determinations made in years commencing in 1982, $136,425.[28] Highly compensated entertainers should utilize defined benefit plans because appropriate actuarial assumptions and plan design frequently allow a significantly larger required contribution than is allowed under a defined contribution plan.

Some corporations adopt a combination of defined contribution and defined benefit plans. Under such circumstances a special computation must be made annually to determine whether the section 415 limitations have been exceeded.[29] A defined contribution plan fraction is established where the numerator is the amount allocated to the participant's account under the defined contribution plan for the year, and the denominator is the maximum amount which could have been allocated under section 415(c). A defined benefit plan fraction is also determined where the numerator is the final retirement benefit calculated for the participant during the year, and the denominator is the maximum benefit allowable under section 415(b) for that year. The limitation on contributions and benefits payable under this combination of plans is exceeded if the sum of these two fractions exceeds 1.4 for any year. The 1.4 Rule allows more liberal contributions and deductions than if only one type of plan were adopted.

However, because of the interplay with Code section 404(a)(7), which limits the deductibility of contributions to a combination of plans to 25 percent of compensation or, if greater, the amount required to meet the minimum standards under Code section 412, few loan-out corporations will adopt a defined benefit plan and a profit sharing plan. Profit sharing plans are not subject to the min-

26. I.R.C. § 415(c)(1)(A).

27. Prior to the enactment of ERISA, no dollar limitations were imposed upon the amounts contributed under defined contribution plans. Therefore, an entertainer earning, *e.g.*, a $1,000,000 annual salary from his loan-out corporation could contribute $250,000 to his defined contribution plan. This is not presently possible, however.

28. I.R.C. § 415(b)(1).

29. I.R.C. § 415(e).

imum funding rules, as are defined benefit, money purchase and target benefit plans. Therefore, where the 1.4 Rule is used, a combination of a defined benefit plan and money purchase or target benefit plan will be used.

When the limitations on contributions and benefits are applied, all defined contribution plans of employers under common control are treated as one plan and all defined benefit plans of employers under common control are treated as one plan. When determining whether a group of employers are under common control, Code sections 414(b) and (c) apply the principles set forth in Code section 1563 concerning the availability of multiple surtax exemptions to a group of controlled corporations. New section 414(m) further aggregates several entities as one employer for these purposes, as described later in this article.

2. *Tax Benefits Derived From Qualified Pension and Profit-Sharing Plans.* Tax deferral is accomplished because employer contributions are deductible by the corporation, but the participants are not taxable on the contributions until actually distributed to them. A substantial benefit of loan-out corporations is that the limitations on contributions and benefits, and on deductions, are less restrictive for corporate plans than for Keogh plans or individual retirement accounts. In addition to tax deferral there are numerous other benefits available from the use of qualified plans.

The trust which is associated with the plan is tax-exempt,[30] so earnings on plan investments are not taxed until actually distributed to the participants. Further, participants may make employee contributions to the plan, within limits,[31] and up to $2,000 of the employee's annual contributions will be tax deductible unless the employee elects otherwise.[32] The earnings are tax-exempt and the full amount of the nondeductible portion of the contributions (but not the earnings) may be withdrawn from the plan at any time without tax consequences if the plan so provides. This allows a qualified corporate plan to function as a tax-free savings account.

Distributions from qualified plans are accorded favorable tax treatment, whether made during lifetime or upon the death of the participant. Lump sum distributions, which are the complete payment within one calendar year of the entire amount to which the participant is entitled from a qualified plan,[33] are taxable to the individual participant at tax rates which would have applied if the full amount were received ratably over a ten year period.[34] The payment, however, must be made upon separation from service or upon attainment of age 59½, and must be made to a beneficiary or to a participant of five years or more. This ten year averaging will reduce the tax rate applicable to the distribution. Lump

30. I.R.C. § 501(a).

31. Participants may contribute to a qualified plan an amount which, when added to all other employee contributions made to the plan by the employee, does not exceed 10 percent of the employee's aggregate compensation during all years in which the plan was in existence. *See* Rev. Rul. 1959-1 C.B. 86; Rev. Rul. 1969-2 C.B. 92. A further limitation is imposed, indirectly, under Code section 415(c)(2)(B) which includes, as part of the annual additions to a defined contribution plan for purposes of determining whether such additions exceed the limitation on contributions, the lesser of (i) the amount of the employee contributions in excess of 6 percent of his compensation, or (ii) one-half of the employee contributions.

32. I.R.C. § 219, as amended in full by ERTA.

33. *See* I.R.C. § 402(e)(4)(A).

34. I.R.C. § 402(e)(1)(C).

sum distributions also can be rolled over tax-free to another qualified plan or to an individual retirement account, further deferring the tax.[35]

Non-lump sum distributions such as annuities and installment payments are taxed to the participant when received, but will be subject to the 50 percent maximum marginal tax rate and subject only to the regular income averaging provisions.

Qualified plans commonly provide for the payment to a designated beneficiary of benefits held for a deceased participant. If these payments are not lump sum distributions, or are lump sum distributions and the recipient elects not to take advantage of the ten year income averaging provisions, and if the distributions are made payable to someone other than to the executor of the participant's estate, then the value of the distributions will be excluded from the decedent's gross estate for estate tax purposes.[36]

3. *Typical Qualified Retirement Plan Problems.*

*a. Prohibited discrimination.* Qualified pension and profit sharing plans may not discriminate in favor of officers, shareholders, or other highly compensated employees.[37] Within certain limitations, equivalent benefits must be offered to all employees who are eligible to participate and satisfy other plan requirements. Although discrimination is generally prohibited, the Internal Revenue Code establishes certain rules which allow limited types of "discrimination." Other techniques may also be used to avoid the antidiscrimination rules.

Employees who are under age twenty-five and have less than one year of service with the employer, or who have less than three years of service if the plan provides for full and immediate vesting upon participation, may be excluded from participation in the plan.[38] In defined benefit plans, but not defined contribution plans, participants within five years of their normal retirement age may be excluded.[39] Union employees may also be excluded from the plan if retirement benefits were the subject of good faith collective bargaining on their behalf.[40] But this exclusion is difficult to use in loan-out corporations because the entertainer for whose benefit the plan is established is often a member of a guild.

If the corporation employs individuals other than the artist, the advantages of a qualified plan may be dissipated. Unless the employees can be excluded by the age or service requirements or by the union exclusion, contributions must be made on their behalf, and this extra cost may be expensive when compared to the available tax benefits. This problem frequently arises with recording groups who employ producers, road crew, technical personnel, and girlfriends.

Under a formerly useful planning technique, a slightly different form of which was the subject of Tax Court litigation, each member of the recording group would form a separate corporation of which he is the sole shareholder, and the

35. I.R.C. §§ 402(a)(5), 402(a)(6).
36. I.R.C. § 2039(c).
37. I.R.C. § 401(a)(4).
38. I.R.C. § 410(a)(1)(B)(i).
39. *Id.*
40. I.R.C. § 410(b)(2)(A).

several corporations would form a partnership which becomes the "band" and the contracting entity. The partnership employs the road crew and other ancillary personnel, and it is the partnership, not the separate corporations, which is engaged by promoters and record companies. Each corporation could establish its own retirement plans, which would not include the ancillary personnel because they are not employees of the corporation, but instead are employed by the partnership, so long as no single corporation owns more than 50 percent of the partnership.

The IRS contended that this arrangement violated the antidiscrimination rules of Code section 401(a). Revenue Ruling 68-370 held that, in a joint venture, for retirement plan purposes, each venturer must provide coverage for each employee of the venture to the extent such employee's compensation is attributable to that venturer's share of the venture. Revenue Ruling 68-370 did not discuss the importance of the amount of the venture owned by each corporation, so whether a corporation owned 1 percent or 99 percent, the IRS required that it take into account a portion of *each* employee's compensation.

ERISA created Code sections 414(b) and (c), which view members of a controlled group of employers as a single employer for retirement plan purposes in accordance with the principles of Code section 1563. This includes determining whether a plan sponsored by any employer discriminates in favor of the prohibited group. When applying section 1563, the share of the partnership owned by each corporation becomes important: if no partner owns more than 50 percent of the profits or capital of the partnership, the various corporations and the partnership will not be treated as a single employer. This question was addressed in two Tax Court cases involving physicians.

In *Thomas Kiddie M.D., Inc. v. Commissioner*,[41] the petitioner and another medical corporation formed a partnership to practice medicine. The partnership employed all the nonphysician employees, but each medical corporation employed its physician-shareholder. A similar fact situation arose in *Lloyd M. Garland, M.D., F.A.S.C., P.A. v. Commissioner*.[42] In both cases, the Tax Court held that employment by the partnership would not be attributed to the petitioner because neither it nor any other corporation or individual owned *more than* 50 percent of the partnership. Therefore, failure to include partnership employees in the retirement plan did not cause the plans to be discriminatory.

Following the *Kiddie* and *Garland* decisions, the IRS abandoned its attack on such arrangements. Instead, it launched a legislative attack and successfully caused the enactment of Code section 414(m) which, for purposes of the nondiscrimination test and other employee benefit requirements, requires all employees of employers who are members of an "affiliated service group" to be treated as employed by a single employer (except as otherwise provided by treasury regulations). "Affiliated service groups" are defined under a different set of rules than are controlled groups under sections 414(b) and (c). An affiliated service group

41. 69 T.C. 1055 (1978).
42. 73 T.C. 5 (1979).

consists of a service organization (the "first organization") and one or more of the following:

(1) Any other service organization which is a shareholder or partner in the first organization and which regularly performs services for the first organization or is regularly associated with the first organization in performing services for third persons; and

(2) Any other organization if (i) a significant portion of the business of the organization is the performance of services for the first organization, for a service organization described in subparagraph (1), or for both, of a type historically performed in the service field by employees, and (ii) at least 10 percent of the interests of the organization is held by persons who are officers, highly compensated employees or owners of the first organization or an organization described in subparagraph (1).

A "service organization" is defined as an organization whose principal business is the performance of services. An "organization" means a corporation, partnership or other organization. In determining ownership, the constructive ownership rules under Code section 267(c) apply. Generally, these rules apply for plan years ending after November 30, 1980, but in the case of qualified plans in existence on November 30, 1980, the rules apply to plan years beginning after that date.

Although the affiliated service group rules are not clear in many respects, the IRS has established procedures whereby a ruling can be obtained as to whether a group of organizations does constitute an affiliated service group.[43]

While this legislation may have eliminated the use of partnerships of corporations for purposes of skirting the nondiscrimination and other employee benefit rules, the use of partnerships of corporations still may be a very sound tax planning tool where members of, for example, a musical group are of different ages with different lifestyles and living requirements so that each may require a different type of retirement plan (or one may require no retirement plan at all). The approach is also useful where each member would prefer to have a separate corporation to conduct independent activities or to avoid dependence on other, less responsible, members of the group to adhere to corporate formalities.

*b. Prohibited transactions.* Qualified plans must be operated exclusively for the benefit of participants and their beneficiaries.[44] This general requirement, as well as the specific enumeration of certain "prohibited transactions," prevents the use of plan assets for the benefit of any employer, trustee or other party-in-interest or fiduciary without a statutory exemption or an administrative exemption obtained from the Department of Labor from the prohibited transaction rules.[45]

*c. Vesting.* A retirement plan which fully satisfies all other Code requirements could nonetheless systematically exclude employees from actual participation by imposing harsh forfeiture provisions upon participants who terminate employment before becoming "fully vested." A plan imposes these forfeitures with a "vesting"

43. *See* Revenue Procedure 81-12. *See also* Revenue Ruling 81-105, which obsoletes Revenue Rulings 68-370 and 75-35.

44. I.R.C. § 401(a)(2).

45. *See* I.R.C. § 4975; ERISA, *supra* note 17, § 406.

schedule that states the percentage of the accrued benefit a participant would receive if he terminates employment before attaining his normal retirement age. Thus, a plan could provide very liberal benefits to all employees, but might provide that a participant who, for example, does not remain employed for twenty years prior to attaining normal retirement age would lose all of his benefits upon the termination of employment. Code sections 401(a) and 411, however, preclude this result by setting forth certain minimum vesting standards[46] which must be satisfied as a condition to qualified status to ensure that the plan is not discriminatory.[47]

*d. Plan administration.* If a qualified plan is not properly administered, discrimination, prohibited transactions, or other events which could disqualify the plan might inadvertently result. In *Allen Ludden v. Commissioner*,[48] the accountant administering the qualified plans failed to allocate pension and profit-sharing contributions to one lower paid employee purely by accident. In that case, the Tax Court held that this mistake could not be retroactively corrected, causing discrimination and disqualification of the plan for the year in question. The court suggested, however, that when a corporation voluntarily corrects defects in its plan, the mistake could be ruled an insubstantial basis for discrimination. In Private Letter Ruling 7949001, the reallocation of contributions to retroactively qualify an otherwise discriminatory plan under generally similar circumstances was allowed where, under Maryland law, mistakes could be corrected provided they were "mistakes of fact" rather than "mistakes of law." In the ruling, the taxpayer was not responsible for the inaccurate allocation and no distributions had been made from the plans, so complete reconstruction of the correct allocation was possible.

4. *Increasing Contributions to Qualified Plans.* While substantial tax benefits are available from proper use of qualified plans, the limitations on contributions and benefits and on deductibility of contributions restrict the availability of these benefits by inhibiting the amounts that can be contributed each year. However, there are techniques available to increase retirement plan contributions and their deductibility.

The adoption of a defined benefit pension plan, either alone or with a money purchase pension plan, is the most common technique for increasing plan contributions. All amounts contributed to a defined benefit pension plan can be deducted by the employer if the contributions do not excessively fund the plan, and the closer an entering participant is to his retirement age, the larger will be the required contribution. Therefore, by establishing a defined benefit plan with a low normal retirement age and with actuarial assumptions which create additional plan costs, the contributions and allowable deductions can be significantly increased.

Pension plans for adolescent entertainers may provide extremely low retirement ages, although the limitation on benefits must be appropriately reduced.[49]

46. I.R.C. § 411(a).
47. I.R.C. § 401(a)(7).
48. 68 T.C. 826 (1977).
49. *See* I.R.C. § 415(b)(1)(C).

This reduction will impact the benefit, and lower contributions under the defined benefit plan. However, since there will be a long period of time between the entertainer's assumed normal retirement age and his death, the cost of purchasing this benefit in the form of an annuity will be quite expensive and may more than offset the required benefit reduction.

If a money purchase pension plan is adopted along with a defined benefit plan, the contributions can be increased further provided both plans, when viewed in combination, satisfy the 1.4 Rule set forth in Code section 415(d).

ERTA now allows employees to deduct up to $2,000 of any "qualified voluntary employee contribution," which is a voluntary contribution made by an individual as an employee under a qualified employer plan which the employee has not designated as a nondeductible contribution.[50]

As will be discussed later in this article, participants may borrow money from the plan. These loans can be structured for the payment of substantial amounts of interest, which should be deductible by the individual,[51] providing another method of transferring tax-free funds into the exempt trust. Since these amounts are not employee contributions, they are not applied toward computing the section 415(c) limitation on contributions.

5. *The Retirement Plan As An Investment Portfolio.* When an entertainer's investments are designed for appreciation and future security rather than for current income and current cash needs, a retirement plan provides an appropriate investment vehicle. While investments which have tax benefits, such as depreciable real estate or investment tax credit personal property, might not be appropriate for a tax-exempt retirement plan trust, other forms of investment might be well suited. Aside from comparatively risk-free investments in treasury bills, certificates of deposit, cash savings accounts and the like, investments such as gold, diamonds, stamps and unimproved real estate, which are likely to appreciate substantially, could be acquired by a qualified trust.[52] Corporate trustees frequently impose internal limitations on the types of investments allowed because of a pervasive fear of fiduciary liability, but such investments are possible, and where the trustee is interfering with such investments, he may be removed and replaced by a more cooperative fiduciary.

The investment program contemplated by the qualified trust should be determined before choosing the type of retirement plan to be created. Investment performance will not affect contributions to a defined contribution plan, but will affect the contributions to a defined benefit plan, if the actual investment performance is not equal to the actuarially assumed investment performance. High return investments may reduce or eliminate the tax advantages of increased contributions to a defined benefit plan, and low or no return investments will require higher

50. I.R.C. § 219.

51. I.R.C. § 163.

52. Under ERTA, the acquisition of collectibles (including works of art, rugs, antiques, metals, gems, stamps, coins, alcoholic beverages or certain other taxable personal property) by an individual retirement account or an individually directed account in qualified employee trust will be treated as a distribution includable in gross income. The taxable amount will be the plan's cost for such collectibles. I.R.C. § 408(n).

contributions, possibly burdening the corporation's cash flow. In a defined benefit plan, a desired dollar amount must be available to purchase the final retirement benefit at the attainment of a participant's normal retirement age. If investment performance is greater than expected, the amount required to attain this desired dollar figure will be less and the annual contribution required to attain this amount will likewise be reduced. If a combination of defined benefit and defined contribution plans is used, the conservative investments may be allocated to the defined benefit plan and the more speculative investments may be allocated to the defined contribution plan.

Certain retirement plan investment problems must be considered. For example, the plan may not engage in a prohibited transaction, which is generally any dealing between the plan and a party-in-interest. These rules are similar to those affecting exempt organizations. ERISA established a procedure whereby the plan or a party-in-interest could apply to the Department of Labor for a specific or class exemption from the prohibited transaction rules. An application for an exemption must show that the transaction is for the benefit of participants and beneficiaries. A cursory review of recent exemptions approved by the Department of Labor shows a trend allowing transactions where the plan sells or leases an asset at fair market value to a disqualified person after the asset has become unproductive of income.

A plan which engages in a prohibited transaction runs the risk of two penalties. First, an excise tax equal to 5 percent of the value of the amount involved in the transaction may be imposed upon the disqualified person, and if the transaction is not corrected after notice, a further tax equal to 100 percent of the amount involved may be imposed. Second, a prohibited transaction will jeopardize the qualified status of the plan because, as discussed above, it may not be operating exclusively for the benefit of participants and beneficiaries.

ERISA requires that plan fiduciaries invest assets "prudently." They must deal with plan assets as would a prudent man acting for his own benefit under like circumstances.[53] Fiduciaries may incur potential civil liability for imprudent investments, but in small plans with few participants or beneficiaries, the extent of this liability is restricted since the only parties who could sue would be other plan participants or beneficiaries. There are no direct adverse tax consequences solely for violations of the "prudent man" rule, although failure to follow the rule may be construed as a failure to administer the plan for the exclusive purpose of providing benefits to participants and beneficiaries.

Although retirement plan investment income is generally tax-exempt, the trust is taxable on its "unrelated business taxable income,"[54] which is generally income generated by a trade or business regularly carried on by the plan or by a partnership of which the plan is a member. The trade or business generally includes any activities carried on for the production of income, sale of goods or performance of services, but usually does not include the mere passive receipt of income.

53. ERISA, *supra* note 17, § 404(a)(1)(B).

54. I.R.C. §§ 511-514.

A type of unrelated business taxable income is "unrelated debt-financed income,"[55] which includes income generated by an investment which is partially or entirely financed with borrowed funds ("acquisition indebtedness"), examples of which include the purchase of securities on margin and businesses conducted by partnerships which buy property with borrowed funds. The pro rata portion of the income attributable to the borrowed funds is taxable to the trust as unrelated business taxable income. For example, if the trust purchases stock on margin with 50 percent cash and 50 percent acquisition indebtedness, 50 percent of the income generated by the investment will be unrelated business taxable income. The same rate applies to trust investments made with the proceeds of loans from insurance policies owned by the plan.

A far-reaching exception to the unrelated debt-financed income rules was recently enacted.[56] The new law provides that, with certain exceptions, debt incurred by a tax-exempt employee trust with respect to real estate investments will not be considered acquisition indebtedness and therefore will not generate unrelated debt-financed income. However, this exception does not apply if (i) the purchase price is not a fixed amount determined as of the date of acquisition, (ii) the purchase price (or the amount or timing of any payment) is dependent, in whole or in part, upon the future revenues, income, or profits derived from the property, (iii) the property is leased back to the transferor or a party related to the transferor, (iv) the property is acquired from or leased to certain persons who are disqualified persons with respect to the trust, or (v) the debt is nonrecourse owed to the transferor (or a related party) which either is subordinate to any other indebtedness secured by the property or bears a rate of interest significantly less than that which would apply if the financing had been obtained from a third party.

Historically, qualified trusts have participated in real estate investments merely as lenders, with limited opportunities for any significant return. However, equity participation, with potential for a large upside return, has now been promoted by Congress. It was noted earlier that real estate investments may not be desirable because the tax benefits are wasted on a tax-exempt trust. However, the potential equity growth may offset this "waste," and it may be more common for trusts to participate in partnerships owning raw land which is leased to a development partnership, thereby shifting the tax benefits to taxpayers who can put these benefits to use.

If a participant wishes to acquire an investment, such as highly leveraged real estate providing tax shelter benefits, individually rather than through the retirement plan, he may borrow the funds with which to make the investment directly from the plan. While a loan between the plan and the participant would normally be a prohibited transaction, Code section 4975(d)(1) provides an exception to the prohibited transaction restriction for loans made to participants or beneficiaries if (i) the loan is available to all participants and beneficiaries on a reasonably equivalent basis, (ii) is not made available to highly compensated employees,

55. I.R.C. § 514.
56. I.R.C. § 514(c)(9).

officers, or shareholders in an amount greater than the amount made available to other employees, (iii) is allowed according to the terms of the plan, and (iv) bears a reasonable rate of interest and is adequately secured.

Interest paid by the participant should be deductible by him for tax purposes.[57] A "reasonable" rate of interest is ordinarily the going rate in the market place.

There is some danger that the IRS will attempt to tax the participant on his receipt of the loan proceeds, claiming that in fact it is a distribution from the plan. In *Jack Fuller v. Commissioner*,[58] the IRS claimed that the taxpayer was taxable under Code section 402(a), but the Tax Court found he had obtained bona fide loan proceeds and in exchange executed two notes, one repaid in 120 equal installments and the other in 60 equal installments, both bearing interest at 9 percent, both adequately secured, and both for principal amounts substantially less than the taxpayer's net worth. Even though the case involved a closely held corporation, the court observed that the many corporate "hats" worn by the taxpayer did not offset the court's conclusion that the transactions were loans.

### D. Other Employee Benefit Plans

Employee benefit plans other than qualified retirement plans provide further advantages to incorporation. For example, the employer may adopt a medical reimbursement plan which pays or reimburses an employee for medical expenses for himself, his wife and eligible dependents.[59] These amounts paid by the employer-corporation are tax deductible by the corporation but are not treated as income to the employee. Commencing January 1, 1980, these plans were made subject to discrimination rules similar to those affecting qualified retirement plans, thereby restricting the advantages of this arrangement for corporations with rank and file employees.[60] In addition, the medical plan must be established for "employees" only, so problems could arise if the only covered employees are shareholders. However, these problems are not characteristic of small loan-out corporations with only one or a handful of employees.

The employer may also obtain a disability income policy for the benefit of its employees.[61] Premiums paid for the policy by the corporation are tax deductible and not included in income by the employee, and benefits payable under the policy are excluded from the employee's income, subject to the statutory limitation on the amount of the exclusion imposed by Code section 106.

## III

## PROBLEMS IN OPERATING LOAN-OUT CORPORATIONS

An entertainer can obtain significant tax benefits by furnishing his services

57. I.R.C. § 163.
58. [1980] T.C. Memo (P-H) ¶ 80,370.
59. I.R.C. § 105.
60. I.R.C. § 105(h).
61. I.R.C. §§ 106, 162.

through a loan-out corporation. However, a number of problems may arise which, if not properly anticipated, could eliminate these benefits and place the performer in a worse situation than if he had operated as a sole proprietor.

### A. Double Taxation

In the example discussed earlier, Johnny Rayguns and J.R., Ltd. are separate taxpayers. In the typical corporate (*e.g.*, General Motors) arrangement, the corporation pays tax on its profits, and its shareholders pay tax on these profits when distributed in the form of dividends. In a loan-out corporation, this double taxation—at the corporate and shareholder levels—can be eliminated by distributing the corporation's "profits" to the shareholder-employee as salary, bonus and employee benefit plan payments, all of which should be deductible by the corporation (unlike dividend distributions), thereby reducing the corporation's taxable income so the only tax is imposed upon the shareholder-employee. However, this technique may result in the employee receiving an unreasonable amount of compensation.

1. *Unreasonable Compensation.* Employers are entitled to deduct compensation paid to employees as an ordinary and necessary business expense, but the amounts of such payments must be reasonable. The employer will be denied a deduction to the extent such compensation is unreasonable, resulting in the double tax which the entertainer wants to avoid. What constitutes reasonable compensation is a continuing source of controversy and commentary. In most cases the compensation a performer receives from his loan-out corporation will be equal to or less than he would have received had he been employed directly by, for example, a studio or record company. The performer's compensation in turn will roughly equate with compensation paid to other performers with equal skills and popularity. Further, loan-out corporations are generally not capital intensive, suggesting that a higher salary is justifiable because the corporation's earnings are generated by the performer's services, not by capital.

In attacking a deduction as unreasonable compensation, the IRS will attempt to capitalize the value of the corporation's employment agreement with the entertainer and require a reasonable rate of return which, they argue, cannot be paid out as compensation. However, it would be difficult for the IRS to successfully capitalize a short-term employment agreement, so a sound tax planning approach is to provide for a one or two year term which could be extended by agreement of the parties.

Note that if part of the deduction for compensation is disallowed, the corporation's problems are compounded because, while the salary has been paid and the employee has borne a tax liability, the disallowed deduction creates a corporate tax liability which the corporation may not have the funds to pay. This problem can usually be mitigated if the employee agrees in writing to reimburse his salary to the extent it is deemed unreasonable. The employee can deduct the repayment for his own benefit, and the corporation will then have the cash with which to pay

the tax.[62]

2. *Accumulation of Income.* The performer may prefer to avoid double taxation by accumulating earnings in the corporation, not distributing profits in any form and thereby avoiding the tax at the shareholder-employee level. But this approach may result in the imposition of either the personal holding company tax or the accumulated earnings tax.

*a. Personal holding company tax.* The personal holding company tax is directed at so-called "incorporated pocket books" or "incorporated talent," such as loan-out corporations. The tax, which is in addition to the regular corporate tax, equals 50 percent of the *undistributed* personal holding company income for tax years beginning after December 31, 1981 (70 percent for prior years),[63] thereby motivating the corporation to distribute rather than accumulate its profits. Since personal holding company income includes amounts received from contracts for personal services,[64] most of a loan-out corporation's income will be personal holding company income. However, personal holding company income will not be derived under a contract which does not state that the services of a specific personality will be provided.[65] The problem with this rule is that producers and promoters will normally require the desired entertainer to excute a guaranty of personal performance. Also, if the type of services required is so unique as to preclude anyone else from rendering them, the contact will likely generate personal holding company income.[66] The personal holding company tax can be avoided simply by distributing such income either as compensation or as dividends.

*b. Accumulated earnings tax.* The accumulated earnings tax forces a corporation to distribute to its shareholders profits which are not required for the "reasonable needs of the business." Since a loan-out corporation normally has low capital requirements, its "reasonable needs" are low, making it more difficult to accumulate earnings at the lower corporate tax rates without being subject to the tax on accumulated earnings. The tax imposed equals 27 percent of the first $100,000 of accumulated taxable income and 38 percent of any excess accumulated taxable income. However, since the accumulated earnings tax is not imposed upon personal holding companies, it usually will not pose a threat to a loan-out corporation.

*c. Subchapter S election.* The entire double taxation problem can be avoided if the loan-out corporation elects to be taxed subject to Subchapter S of the Internal Revenue Code.[67] The effect of this election is that the net income or loss of the corporation is taxable directly to its shareholders, whether or not distributed to them, in a manner which is similar to partnership taxation. Double taxation is avoided because there is no corporate tax imposed, and for the same reason there can be no personal holding company tax or accumulated earnings tax. Further,

---

62. Oswald v. Comm'r, 49 T.C. 645 (1969); Rev. Rul. 115, 1969-1 C.B. 50.

63. This reduction was imposed by ERTA to equate the personal holding company tax with the maximum marginal tax rate that could be imposed upon individuals.

64. I.R.C. § 543.

65. Rev. Rul. 249, 1975-1 C.B. 171; Rev. Rul. 250, 1975-1 C.B. 172.

66. Rev. Rul. 67, 1975-1 C.B. 169.

67. I.R.C. §§ 1371-1379.

the issue of unreasonable compensation will not arise because all corporate income is deemed distributed as profits.

Subchapter S corporations are not a panacea, however. Aside from some tricky technical requirements[68] which, if not carefully followed, may jeopardize the election, the retirement plan benefits described earlier are severely restricted. Contributions to a Subchapter S corporation's defined contribution plan are limited to the lesser of $15,000 or 15 percent of an employee's salary for plan years beginning after December 31, 1981 ($7,500 or 15 percent for prior years). For this reason alone, it is generally preferable not to elect Subchapter S treatment and simply to plan for the compensation and double taxation problems described above.

B. Assignment and Reallocation of Income

Income is taxed to the person or entity who earns it, and the anticipatory assignment of income already earned will not effectively divert the tax liability.[69] This issue commonly arises where the artist, in his individual capacity, executes a contract, commences (and perhaps completes) performing services, and then later forms a corporation to which payments are made, under a contract or an amendment thereto, for services performed before incorporation. Under the doctrine of anticipatory assignment, the corporation may be disregarded for tax purposes because the individual, not the corporation, furnished the services.

Ideally, the corporation should be formed before the artist executes any personal service contracts, and the original contract should be executed in the name of the corporation furnishing the services of the artist. Where the artist has already executed the contract as an individual and performed services thereunder, and it later appears that incorporation is a good tax planning mechanism, the contract should be renegotiated. For example, if Johnny Rayguns had signed a three picture deal as an individual and would receive "points" in addition to a flat salary, and if the first film is a huge success and the producer is willing to increase his points or other payments, the first film could be severed from the second two films and a new contract created, but this time executed by J.R., Ltd., furnishing the services of Johnny Rayguns. The new contract should be independent of the first contract. This technique would not work, however, if the services have been fully performed.

The IRS has the power to reallocate income among two or more taxpayers owned or controlled by the same interests if the reallocation is required to either prevent evasion of taxes or clearly reflect the income of a taxpayer.[70] Even if an express or implied assignment of income has not occurred, the IRS may nonetheless contend that income is most clearly reflected when reported directly by the individual rather than by the corporation. This power will also be invoked when

68. *Id.*
69. Lucas v. Earl, 281 U.S. 111 (1930).
70. I.R.C. § 482.

it appears that the requisite corporate formalities have not been followed or that the corporation was operated improperly.

In *Jerome Roubik*,[71] a corporation consisting of four radiologists was disregarded when the Tax Court found the corporate operation to be little more than a system of collective bookkeeping. The individuals earned wages independently and then deposited their wages in a corporate account for distribution. The corporation exerted no effective control over the individuals and no work was contracted through the corporation.

Although *Roubik* was a glaring example of an improperly operated corporation, the validity of the corporation may be questioned even when certain aspects of normal corporate functioning appear if a full range of functions do not exist. In *Frederick H. Foglesong*,[72] the Tax Court ruled that although the corporation was a separate taxable entity, its primary purpose was to avoid taxes. In deciding to disregard the corporate entity, the court noted the following: that Foglesong, not the directors, exerted control over corporate policies; that Foglesong was the sole employee for most of the corporation's existence; that Foglesong had no written employment agreement; and that he had not given a covenant not to compete with his employer.

The Court of Appeals for the Seventh Circuit reversed the Tax Court,[73] however, and upheld the corporation's validity, noting the following factors:

(i) The corporation was a party to contracts under which services were performed;

(ii) The corporation was recognized as a viable entity;

(iii) Nontax business reasons for the corporation existed;

(iv) The corporation was not formed to take advantage of losses incurred by a separate business;

(v) The corporate form was consistently honored by the taxpayer in transactions resulting in corporate income;

(vi) The taxpayer rendered services only to the corporation; and

(vii) None of the corporate income was received from related entities or persons.

However, the court of appeals noted that irregularities in the corporate structure could serve as the foundation for narrower and more appropriate challenges to the corporate entity.

On remand, the Tax Court again disregarded the corporate entity, this time not under the assignment of income doctrine, but instead under the Commissioner's broad discretion to reallocate income between related entities under Code section 482. This will be discussed further below.

The IRS, in Letter Ruling 8031028, disregarded a corporation (with a single employee) which was a member of a partnership, and stated seven reasons, all involving a lack of corporate functions:

71. 53 T.C. 365 (1969).
72. 35 T.C.M. 1309 (1976).
73. 621 F.2d 865 (7th Cir. 1980).

(i) There was no evidence that the *corporation*, instead of the shareholder-employee, was the member of the partnership (*i.e.*, no written partnership agreement);

(ii) The shareholder-employee, who was the original member of the partnership, never formally assigned his partnership interest to the corporation;

(iii) The shareholder-employee never agreed in writing not to compete with the corporation;

(iv) Insurance policies did not insure the corporation;

(v) The shareholder was the corporation's sole employee;

(vi) The corporation incurred no indebtedness; and

(vii) The shareholder-employee was never paid a salary, but instead received loans from the corporation.

In *McGee v. United States*,[74] income from a personal services contract entered into with a hospital by a doctor, who later incorporated and transferred the contract to the professional corporation, was found taxable to the corporation and not to the doctor. The district court held that the corporation was a viable tax entity, not a sham for tax purposes, and that the IRS could not allocate the income to the doctor under Code section 482 because there was no distortion of income to avoid taxation. *McGee* differs from the example with Johnny Rayguns in that the hospital contract was executory—services to the hospital continued to be performed in exchange for compensation—while in the example, all the services had been completed, at least with respect to the first picture. Thus, borrowing from the doctrine of *Lucas v. Earl*, in *McGee* the fruits came from a new tree which had been effectively transplanted in the new corporation, while in our example, the tree was firmly rooted in the individual and could not be moved.

Two early tax cases involving transfers of employment contracts to personal service corporations show the IRS argument that the existence of a personal service corporation should be disregarded because the corporation is a mere alter ego of the service-performing taxpayer. In *Fontaine Fox v. Commissioner*,[75] the taxpayer was a cartoonist who transferred his cartoon copyrights and various royalty contracts to his personal service corporation and then contracted with the corporation to render his services exclusively to it for a fixed salary. The corporation in turn contracted with a cartoon distributor, and was paid based upon a percentage of sales from newspapers carrying the comic strip. Similarly, in *Laughton v. Commissioner*,[76] Charles Laughton contracted exclusively with his corporation in exchange for a fixed salary plus expenses. The corporation in turn contracted with various motion picture studios for the loan of Laughton's services. In both cases the Board of Tax Appeals rejected the government's attempt to apply the sham doctrine, noting that the general rule requiring treatment of a corporation and its stockholder as separate entities should be disregarded only in exceptional circumstances where it otherwise would present an obstacle to the due protection or enforcement

74. 1981-1 U.S.T.C. (CCH) ¶ 9184.
75. 37 B.T.A. 271 (1938).
76. 40 B.T.A. 101 (1939).

of public or private rights. In *Fox* and *Laughton*, the facts did not warrant disregarding the corporations as separate entities because valid personal service corporations were found to exist and because the taxpayers had observed all requisite formalities in establishing, assigning contracts to, and signing employment contracts with their corporations. In *Moline Properties v. Commissioner*,[77] the United States Supreme Court outlined the proper test for corporate recognition, noting that the corporate identity doctrine

> fills a useful purpose in business life, whether the purpose of incorporation is to gain some advantage under state law, to avoid or comply with creditors' demands, or to serve the creator's personal or undisclosed convenience. So long as [the purpose of incorporation] is the equivalent of business activity or [the creation of the corporation] is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.[78]

Under the *Moline Property* rule, any challenge for tax purposes to the legitimacy of a corporation will be dismissed if the taxpayer can prove a valid business purpose either in establishing the corporation or in the conduct of business activity. In fact, the corporation will be recognized even if the business purpose is limited, or the business activity is minimal, so long as the requisite corporate formalities are met and it is apparent that the corporation was managed as a viable concern and not simply as a facade.

The foregoing cases and rulings indicate the essential importance of carefully and consistently adhering to strict corporate formalities when operating loan-out corporations. Always maintain the separate identities of the artist (shareholder-employee) and the corporation. Separate books of account are mandatory, and the artist must have a written employment agreement with the corporation which includes a covenant not to compete. Regular salaries should be paid to all employees, with proper withholding. If appropriate, the corporation should become a signatory to appropriate union and guild agreements and abide by them. Corporate action must be evidenced by properly prepared corporate minutes and by regularly held shareholder and director meetings.

In the entertainment industry it is common for producers, promoters, etc., to require an artist to execute a guaranty that he will personally perform the services contracted for by the loan-out corporation. While it will be extremely difficult to avoid giving this guaranty, its existence poses a serious threat to the viability of the corporation as an independent entity. Consequently, these guarantees must be negotiated with great care and drafted skillfully.

Should the IRS successfully reallocate the corporation's income to the artist, the corporate benefits described above will be lost and the artist will find himself in the same position as if he had done absolutely no tax planning.

### C. Application of Code Sections 269 and 482

Since the sham and assignment of income doctrines are not likely to successfully penetrate the corporate existence for tax purposes, it is likely that the IRS

---

77. 319 U.S. 436 (1943).
78. Id. at 446.

will attempt to utilize the statutory weapons provided by Code sections 269 and 482.

1. *Code Section 269.* Code section 269 provides that if a person acquires direct or indirect control of a corporation for the principal purpose of tax evasion or avoidance by securing the benefit of the deduction, credit or other allowance which such person or corporation would not otherwise enjoy, the deduction, credit or other allowance may be disallowed. The amount of the disallowance is left to the discretion of the Secretary of the Treasury. The determination of control (which is defined as ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of a corporation) can be ascertained objectively, but it is more difficult to determine whether the principal purpose was evasion or avoidance of taxes. A principal issue in Private Letter Ruling 7939003 was whether section 269 could be applied to disallow deductions for pensions and medical benefits. In analyzing its potential applicability, the IRS listed three factors that are relevant to a determination of whether the principal purpose test is satisfied or not:

(i) Whether the party setting up the corporation was aware of the corporate tax benefits at the time the corporation was formed.

(ii) Whether operation in corporate form is necessary or useful to the parties setting up the corporation.

(iii) Whether or to what extent the benefit would have been available absent operation in corporate form.

The IRS noted that the presence or absence of these factors was not necessarily conclusive.

In most situations the first and third of these tests would be satisfied, but the critical factor is the business purpose test. Business purposes can typically be shown in the availability of limited liability, diversification of operations and other standard business reasons for establishing a corporation. This should provide a substantial detriment to the application of section 269 to loan-out corporations.

2. *Code Section 482.* Code section 482 provides that the Secretary of the Treasury may distribute a portion or allocate gross income, deductions, credits, or allowances between or among two or more organizations, trades or businesses whether or not incorporated if it is determined that distribution, apportionment or allocation is necessary to prevent evasion of taxes or to clearly reflect the income of any of such organizations, trades or businesses. As with section 269, discretion is placed in the hands of the IRS to properly reflect income or determine that the taxpayer's intention is to evade taxes. The most notable early case under section 482 was *Borge v. Commissioner*,[79] where Victor Borge transferred a poultry business with substantial losses to a corporation and also entered into a contract with the corporation to perform entertainment and promotional services for five years for $50,000 per year. During the five year period at issue, the corporation's net entertainment income averaged over $166,000 per year. The Second Circuit,

79. 405 F.2d 673 (2d Cir. 1968).

affirming the Tax Court, held section 482 applicable to allocate additional income to Victor Borge personally. The taxpayer's objection was that there were not two or more organizations involved and that, consequently, section 482 did not apply. However, the court noted that Borge was in the business of entertaining. He did not devote his time and energy to the corporation, but carried on a career as an entertainer and merely channelled his entertainment income through the corporation. Hence, this same problem could be raised with most loan-out corporations.

Two recent cases reflect the extent to which the Tax Court will accord respect to the Commissioner's power under Code section 482. In *Foglesong v. Commissioner*,[80] after the Seventh Circuit had reversed and remanded an earlier Tax Court opinion, discussed above, the Tax Court found that section 482 could be invoked to reallocate to its sole shareholder virtually all of the income otherwise attributable to a corporation. The Tax Court noted that the Commissioner has broad discretion in applying section 482, and that the Commissioner's determination must be upheld unless the taxpayer can prove that the determination is arbitrary, capricious or unreasonable.

To test the arbitrary nature of the Commissioner's determination in *Foglesong*, the Tax Court considered whether and to what extent actual dealings between Mr. Foglesong and his corporation reflected arm's-length dealings between two unrelated parties. The court found no arm's-length relationship, citing several factors. For example, prior to incorporation Mr. Foglesong had recognized the entire net income of his business, and his primary motive for incorporating was the avoidance of taxes by splitting commission income between the corporation and himself. However, after incorporation, Mr. Foglesong's salary and employee benefits substantially deviated from what he had been receiving previously, and did not accord with his worth to the corporation.

Thus, in a personal service corporation, arm's-length dealing must exist between the corporation and the single shareholder-employee. However, certain comments in the new *Foglesong* decision are worth noting. For example, the court recognizes that Mr. Foglesong may have had other bona fide reasons for incorporating, such as limiting liability and diversifying his business. Because of these reasons the Tax Court did not consider the sham doctrine. More importantly, the Tax Court made a special effort to note that it did not intend to discourage the use of the corporate form for personal service businesses where one of the purposes for incorporation was to take advantage of certain intended federal tax law benefits, such as medical reimbursement plans, death benefits and retirement plans. The Tax Court noted specifically that Congress intended such a use of the corporate form, and that it would be inappropriate for the court to rule to the contrary.

In *Keller v. Commissioner*,[81] the Tax Court was confronted with a taxpayer (a physician) who organized and operated a one man professional corporation under the corporation laws of Oklahoma. The corporation adopted various employee benefit plans, and the taxpayer and the corporation entered into an agreement for

80. 77 T.C. —— (Nov. 16, 1981).

81. 77 T.C. 1014 (1981).

the taxpayer's services at the time of the organization of the corporation. A divided court, with six judges dissenting, held that the Commissioner's attempt to allocate 100 percent of the corporation's income to the taxpayer under Code section 482 was arbitrary and excessive because the taxpayer's total compensation (salary, pension plan contributions and medical benefits) from the corporation was essentially equivalent to that which he would have continued to receive absent the organization of the corporation, and therefore essentially equivalent to what the taxpayer would have bargained for in an arm's-length transaction with an unrelated party. Unlike the situation in *Foglesong*, Dr. Keller "zeroed-out" his corporation at the end of the fiscal year, paying such final distributions in the form of bonuses and pension contributions.

Judge Wilbur's dissent in the *Keller* decision is interesting because it recognizes that "[a]fter this decision, anyone may form a corporation, paper the file a little, and market his services with his salary being paid to his corporation. If Dr. Keller can do this, so can the technicians . . . working by his side. And nurses, teachers, pilots, truck drivers, and virtually any other employee one can think of . . . ."[82]

## IV

## CONCLUSION

This article has attempted to display how a loan-out corporation is an effective tax planning tool for successful entertainers. Principally, the loan-out corporation allows for the deferral of income through the adoption of various employee benefit programs and the election of a fiscal year. There are many problems which must be confronted when dealing with loan-out corporations, but these problems can be minimized or avoided with careful planning.

## V

## POSTSCRIPT

As noted earlier, the Tax Equity and Fiscal Responsibility Act of 1982[83] substantially modifies the Code as it affects loan-out corporations and employee benefit plans. The following discussion will highlight the essential provisions of TEFRA as they impact the topics discussed in this article.

### A. Personal Service Corporations Formed or Availed of to Avoid or Evade Income Tax

New Code section 269A[84] provides that the IRS may allocate income, deductions, credits, exclusions, and other allowances of a corporation between or among the corporation and its "employee-owners" (*i.e.*, employees who own more than 10 percent of its outstanding stock) if the corporation's *principal* activity is the performance of personal services, *substantially* all of these services are performed by

---

82. *Id.* at 1039-40.
83. H.R. 4961, 97th Cong., 2d Sess., 128 CONG. REC. H6167 (daily ed. Aug. 17, 1982).
84. Effective for taxable years beginning after December 31, 1982.

employee-owners for or on behalf of *one* other partnership, corporation or other entity, and the corporation is availed of for the *principal* purpose of *avoidance or evasion* of income tax by securing significant tax benefits *not otherwise available* for any employee-owner (*e.g.*, pension benefits and medical reimbursement plan deductions). This provision was designed specifically to overturn a number of cases, including particularly the *Keller* decision,[85] where the personal service corporation was recognized for tax purposes even where its sole purpose was to secure tax benefits through pension plan deductions.

The most obvious impact of section 269A is to eliminate the potential benefits of forming a partnership of personal service corporations.[86] It will also affect personal service corporations employed by studio executives and by artists under contract to just one entity (*e.g.*, a publishing company). The major purpose of this legislation is to avoid the accumulation of income within the corporation at the lower tax rate. While, as with all provisions of TEFRA, the law is so new and complex that it is presently difficult to make any final judgments as to its true impact, a few points are worth noting.

First, as mentioned earlier, some loan-out corporations not only render personal services, but also engage in development and production. If the corporation's principal activity is the *production* for sale or license of, for example, a master recording or completed motion picture, does section 269A, which applies where the principal activity is the performance of personal services, still apply?

Second, within two years any self-employed person can establish a Keogh plan which will be just as useful and beneficial as a qualified corporate plan. This may make the use of personal service corporations unnecessary, and may establish the need to liquidate many existing corporations. The only real tax benefit to incorporating may then be the initial fiscal year rollover.[87]

### B. Limitations on Contributions and Benefits

One of the most significant changes made by TEFRA in the pension area is the reduction in the Code section 415 limitations on contributions and benefits.[88] Code section 415(c)(1) has been amended to reduce the defined contribution limitation from the 1982 level of $45,475 to $30,000, and Code section 415(b)(1) has been amended to reduce the defined benefit limitation from the 1982 level of $136,425 to $90,000. Further, TEFRA has frozen new cost of living adjustments until years beginning in 1986 and has revised the formula for adjusting the cost of living to tie it to social security benefit changes rather than the amount of income subject to social security taxes. The base period with respect to such adjustments shall be the calendar quarter beginning October 1, 1984.

The dollar limitation for defined benefit plans, *i.e.*, the annual benefit which

---

85. 77 T.C. 1014 (1981); *see* text accompanying note 81 *supra*.

86. *See* p. 58 *supra*.

87. *See* p. 52 *supra*.

88. These changes in the Code § 415 limitations are effective for plan years ending after July 1, 1982 if the plan was not in existence on July 1, 1982. In the case of a plan which was in existence on July 1, 1982, the changes will be effective for years beginning in 1983.

one could receive upon retirement, was formerly applied to benefits payable at age 55 or later. The new $90,000 limitation applies with respect to benefits payable at age 62 or later. If a plan calls for benefit payments prior to age 62, the limitation must be reduced actuarially. The limitation for benefits beginning at age 55, however, will not be less than $75,000.

Under prior law, if a participant was covered by both a defined contribution and defined benefit plan maintained by the the same employer, he could receive a greater benefit than if he were covered by only one plan. The total benefit could not exceed 1.4 times the separate percentage or dollar limitations applicable to the two types of plans.[89] This 1.4 multiplier has been reduced to 1.25 with respect to the dollar limitation, thereby decreasing the additional benefits a participant can receive by utilizing two plans.

These limitations will seriously impact many loan-out corporations which were established due to the attractiveness of a defined benefit plan to which contributions of up to $100,000 or more could be made annually. The limitation reduces the amount of the available benefit and hence the annual contribution required to fund that benefit, so the contributions required may now be too small to justify the continuation of the plan and/or the corporation. In fact, in some situations, the reduced benefit will cause the plan to be fully funded, in which case no future contributions will be required, at least until future cost-of-living adjustments are made.

C. Top-Heavy Plans

In an attempt to prevent employers from designing plans that provide substantially all of the benefits to a select group of individuals, TEFRA adds new Code section 416, which provides special rules for "top-heavy plans."[90] A top-heavy plan is a plan in which the accrued benefits or contributions on behalf of "key employees" exceed 60 percent of the total accrued benefits or total contributions of all employees. Key employees are participants who at any time during the plan year or any of the four preceding plan years were: (i) officers of the employer; (ii) the ten employees owning the largest interest in the employer; (iii) 5 percent owners of the employer; or (iv) 1 percent owners of the employer having an annual compensation from the employer of more than $150,000. Self-employed individuals are treated as employees for purposes of determining whether they are key employees.

If a plan is considered a top-heavy plan, there are special requirements that must be met in order for the plan to remain qualified. These requirements cover vesting, minimum benefit accruals, and a limitation on a compensation allowed to be taken into account in computing benefits.

For vesting purposes, a top-heavy plan will be qualified only if non-key employee participants are vested 20 percent after two years of service and an additional 20 percent each year thereafter, resulting in 100 percent vesting after six

89. *See* p. 56 *supra*.

90. The top-heavy plan rules of § 416 are applicable to years beginning in 1984.

years. Alternatively, a plan can provide a three-year eligibility requirement and 100 percent vesting upon participation in the plan.

The minimum benefit requirements, although technical in nature, are not extremely rigorous. For defined benefit plans, a non-key employee must accrue benefits at a rate of 2 percent of his average pay per year for his first ten years of service. For defined contribution plans, the employer contributions for each participant who is a non-key employee may not be less than 3 percent of such participant's compensation. For purposes of these minimum contribution and benefit accrual requirements, contributions and benefits under social security may not be taken into account. Average pay is based upon an employee's highest five consecutive years.

The most significant restriction on top-heavy plans in many cases will be the requirement that the annual compensation taken into account to determine contributions or benefits cannot exceed $200,000 for any employee. This $200,000 amount is adjusted annually in the same manner as the Code section 415 limitations. Under certain circumstances the 1.25 limit for combinations of plans under Code section 415 must be reduced to 1.0.

D. Parity for Keogh Plans

The distinction between Keogh plans and qualified corporate plans are generally eliminated for fiscal years beginning after December 31, 1983. Special Keogh rules are repealed, including those which: set lower limits on contributions and benefits for self-employed individuals; prevent certain Keogh plans from limiting coverage to a fair cross-section of employees; and prohibit social security integration and individual trustees. Certain rules previously affecting only Keogh plans are now extended to all plans, including rules relating to the availability of the estate tax exclusion for death benefit payments.

E. Loans from Retirement Plans

By the creation of a new Code subsection 72(p), retirement plan loans to participants from all plans of an employer and members of the employer's affiliated service group will now be limited to an outstanding balance equal at any time to the lesser of $50,000 or one-half of the participant's vested accrued benefit. Participant loans must be repaid within five years. If either of these rules is not satisfied, the excess or the portion not repayable within five years will be treated as distributed from the plan at the time of the loan, and therefore taxable. If the loan proceeds are used to acquire, construct or substantially rehabilitate a building used as the participant's principal residence, the loan need not be repaid within five years.[91]

---

91. These limitations apply to loans made after August 13, 1982. A participant may, however, borrow money from the plan after August 13, 1982 to make a required principal payment of a plan loan which existed on August 13, 1982 which was required to be made before August 14, 1983, if such new loan must be paid on or before August 14, 1983.

### F. Estate Tax Exclusion for Annuities

TEFRA makes two significant modifications to Code section 2039 affecting the estate tax exclusion of amounts paid as annuities from qualified plans. First, the estate tax exclusion is extended to distributions from Keogh plans and individual retirement accounts as well as for qualified corporate plans. Second, the amount of the distributions eligible for the estate tax exclusion is limited to $100,000.[92]

### G. Liquidation of Personal Service Corporations

The foregoing new rules may cause many personal service corporations to contemplate liquidation. However, personal service corporations—particularly loan-out corporations which accumulate residuals and profit participations—would be subject to immediate taxation at ordinary income tax rates on their receivables *unrealized at liquidation*. Congress recognized that a hardship would be imposed on such corporations, and therefore created a special transitional rule under which personal service corporations may complete a one-month liquidation under section 333 during 1983 or 1984 without incurring a tax on their unrealized receivables. The income represented by the unrealized receivables, however, will retain its character as ordinary income and will be fully recognized by the distributee shareholder upon subsequent collection or other disposition following liquidation.

### H. Group Term Life Insurance

Code section 79, relating to group term insurance provided by an employer for his employee, is amended by the addition of a set of nondiscrimination rules.[93] In the case of a discriminatory group term life insurance plan, the amount expended by the employer with respect to premiums shall be included in the taxable income of any "key employee." The key employee for this purpose is the same as for purposes of the pension plan rules.

In order to avoid being a discriminatory group term life insurance plan, the plan must benefit 70 percent or more of all employees, at least 85 percent of all participants must not be key employees, or, the plan must benefit employees that qualify under a classification found by the Secretary of the Treasury not to be discriminatory. Certain employees may be excluded for purposes of determining whether the above requirements have been satisfied. These include employees who have not completed three years of service, part-time or seasonal employees, union employees and employees who are nonresident aliens. A plan must also provide nondiscriminatory benefits. It is permissible, however, to provide insurance coverage that bears a uniform relationship to compensation.

---

92. These rules apply to decedents dying on or after December 31, 1982.
93. The new rules are effective with respect to taxable years beginning after December 31, 1983.