# Exhibit 2

# ARTICLE: Copyright Termination and Loan-Out Corporations: Reconciling Practice and Policy

Winter, 2012

**Reporter**

3 Harv. J. of Sports & Ent. Law 55 *

**Length:** 10290 words

**Author:** by Aaron J. Moss [1] and Kenneth Basin [2] *

* The authors would like to thank Dan Nabel, Bill Gable, Eugene Karlik, and Katie Weiss for their valuable insights, contributions, and comments on early drafts.

# Text

## [*56]  INTRODUCTION

On January 1, 2013, the first generation of copyright transfers made under the 1976 Copyright Act will become eligible for statutory termination, enabling creators of copyrighted properties and their heirs to unwind their own transactions and reacquire potentially valuable rights to longsince transferred works. The implications for successful, enduring franchises created after 1978 could be dramatic.  [3] For example, when rights to *The* **[*57]** *Terminator* film franchise went up for sale in December 2009, speculation that James Cameron might eventually seek to recapture the copyright in the franchise raged, and potentially depressed the franchise's value at auction.  [4] More recently, in August 2011, the former lead singer of 1970s disco group the Village People made headlines by

---

[1]  Partner, Greenberg Glusker Fields Claman & Machtinger, LLP; J.D. *magna cum laude*, Harvard Law School, 1997.

[2]  Associate, Greenberg Glusker Fields Claman & Machtinger, LLP; J.D. *magna cum laude*, Harvard Law School, 2008; winner, Sears Prize, 2007.

[3]  High-profile disputes over pre-1978 copyright transfers that are already subject to termination have already proven big news -- and big business -- in the entertainment industry. In 2008, the heirs of Superman co-creator Jerome Siegel famously recaptured a portion of the copyright to the iconic superhero. Siegel v. Warner Bros. Entertainment Inc., 542 F. Supp. 2d 1098 (C.D. Cal. 2008). Similarly, shortly after media giant Disney announced its $ 4 billion acquisition of Marvel Entertainment, it received 45 notices of copyright termination from the heirs of Jack Kirby, co-creator of many of Marvel's most valuable franchises, including Spider-Man, X-Men, and the Fantastic Four. Brooks Barnes & Michael Cieply, *A Supersized Custody Battle Over Marvel Superheroes*, N.Y. Times, Mar. 20, 2010, *availa ble at* http://www.nytimes.com/2010/03/21/business/21marvel.html; Michael Cieply & Brooks Barnes, *Disney Faces Rights Issues Over Marvel*, N.Y. TIMES, Sept. 20, 2009, *available at* http://www.nytimes.com/2009/09/21/business/21marvel.html. In July 2011, the Southern District of New York granted summary judgment in Marvel's favor, finding that the Kirby heirs' termination notices were invalid because Kirby's contributions had been works for hire. Marvel Worldwide, Inc. v. Kirby, 756 F. Supp. 2d 461 (S.D.N.Y. 2011). An appeal is likely.

[4]  Matthew Garrahan, *Puzzle Posed by Terminator Auction*, FIN. TIMES, Dec. 11, 2009, *available at* http://www.ft.com/cms/s/0/86151482-e67f-11de-98b1-00144feab49a.html.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 3 of 32

3 Harv. J. of Sports & Ent. Law 55, *57

serving notice on the publishing companies that manage the group's catalog that he intended to recapture his purported share of the copyright in the iconic hit "Y.M.C.A." [5]

But many artists, writers, and other content creators who attempt to recapture rights in previously transferred works may be in for a rude surprise. Artists who, for tax reasons, have utilized so-called "loan-out corporations" (entities by which artists "loan out" their own personal services to employers) may find that they have unwittingly nullified their own copyright termination rights by rendering their creative efforts "works for hire," and therefore ineligible for termination.

This article examines, and seeks to reconcile, the conflict between the widespread use of loan-out corporations in the entertainment industry and the 1976 Copyright Act's restriction on artists' termination rights. Part II reviews the background, policy rationale, and general legal structure of the termination rights, as embodied in the Copyright Act. Part III offers a brief summary of the history and rationale of loan-out corporations and explains in greater detail the challenges they pose to statutory termination rights. Part IV explores and critiques the legal arguments that lawyers and litigants might use to invoke termination rights for artists who have relied on loanout corporations. Part V assesses options for legislative and contractual amendments that would alleviate the conflict between loan-out corporations and termination rights. Part VI concludes.

## [*58]   II. COPYRIGHT TERMINATION UNDER THE 1976 COPYRIGHT ACT

*A. A Brief History of Statutory Termination Rights*

By passing the Copyright Act of 1976, Congress abandoned the unwieldy and procedurally unforgiving two-term system set forth in the previous 1909 Act, in favor of a unitary term of protection for new works created on or after January 1, 1978. Under the prior Act, copyright protection lasted for twenty-eight years from the date of first publication, plus an additional twenty-eight years upon a timely renewal, resulting in a maximum protection of fifty-six years. [6] If the copyright owner did not renew on time (or neglected to clear various other procedural hurdles [7]), the work would fall into the public domain. [8]

In theory, the 1909 Act's renewal system was designed to benefit authors and their heirs, by giving those authors who sold their works for comparatively small sums the exclusive right to recapture the copyright for the renewal term, thereby sharing in any long-term success of the work. [9] In practice, however, authors with little bargaining power were often required to assign both the initial and renewal copyright terms to publishers in advance. The Supreme Court upheld this practice in *Fred Fisher Music Co. v. M. Witmark & Sons*. [10] As a result, Congress's

---

[5]  Larry Rohter, *A Village Person Tests the Copyright Law*, N.Y. TIMES, Aug. 16, 2011, *available at* http://www.nytimes.com/2011/08/17/arts/music/village-people-singer-claims-rights-to-ymca.html.

[6]  Act of March 4, 1909, ch. 320, 35. Stat. 1075, as amended and codified (hereinafter "1909 Act") § 23.

[7]  Formal registration was required to secure federal copyright protection for unpublished works. 1909 Act § 12. For published works, publication without proper statutory notice of copyright caused the work to automatically fall into the public domain. Twin Books Corp. v. Walt Disney Co., 83 F.3d 1162, 1166 (9th Cir. 1996).

[8]  LaCienega Music Co. v. ZZ Top, 53 F.3d 950, 954 (9th Cir. 1995), *superseded by statute on other grounds*, 17 U.S.C. § 303(b) (2006) (under 1909 Act, "[f]ailure to renew a copyright after 28 years irrevocably injects the work at issue in the public domain").

[9]  H.R. REP. No. 2222, at 14 (1909) ("It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term.").

[10]  318 U.S. 643 (1943).

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 4 of 32

3 Harv. J. of Sports & Ent. Law 55, *58

intent to confer the benefit of the renewal term on authors and their heirs was, in the words of one Supreme Court justice, "substantially thwarted." [11]

**[*59]** The 1976 Copyright Act took effect on January 1, 1978. The 1976 Act replaced the two-term system with a single term for new works that endured for the life of the author, plus fifty years. [12] In the case of already subsisting copyrights, the 1976 Act extended the second term of protection by nineteen years, from twenty-eight to forty-seven years (the "Extended Renewal Term"), thereby extending the total term of protection from fiftysix years to seventy-five years. [13]

Congress recognized that many authors and their heirs would have no opportunity to share in the fruits of this Extended Renewal Term because they had previously assigned away their copyright interests, including all renewal term rights, in perpetuity. [14] In order to allow these heirs to reap the financial benefit of the additional nineteen-year term, the 1976 Act created a new right of termination, enabling authors and certain specified heirs to recapture, for the Extended Renewal Term, rights in works that had previously been granted to third parties. The House Report accompanying the 1976 Act explained that "[a] provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." [15]

Of course, this was the same rationale that underpinned the decision to give authors the benefit of the renewal term under the 1909 Act. [16] In order to prevent publishers from requiring authors to waive their termination rights in advance, as they had with renewal rights, the termination provisions permit an author or his heirs to terminate a grant and any right under it "notwithstanding any agreement to the contrary." [17] At the same time, **[*60]** the termination statute was intended to reflect "a practical compromise that [would] further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved." [18] Therefore, unlike the previous renewal system, reversion through termination is not automatic under the current Act. Termination may only be effected through affirmative action on the part of the author or his statutory successors, who must serve an advance notice on the current copyright owner "within specified time limits and under specified conditions." [19]

*B. Mechanics of Termination* [20]

---

[11]  Mills Music, Inc. v. Snyder, 469 U.S. 153, 185 (1985) (White, J., dissenting).

[12]  17 U.S.C. § 302(a) (1994) (amended 1998). In 1998, Congress added an additional twenty years of protection. Works created on or after January 1, 1978 are now protected for the life of the author plus seventy years. 17 U.S.C. § 302(a) (2006). 17 U.S.C. § 302(a) (1994) (amended 1998).

[13]  17 U.S.C. § 304(b); *see* H.R. REP. No. 1476, at 135, 139-40 (1976); *see also*, S. REP. NO. 94-473 at 117, 122 (1975). The duration of copyright for works created prior to January 1, 1978 is now 95 years. 17 U.S.C. §§ 302(a), 303(a).

[14]  H.R. REP. NO. 1476, at 140-41; S. REP. NO. 94-473, at 123-24.

[15]  H.R. REP. NO. 1476, at 124.

[16]  *See supra* note 9.

[17]  17 U.S.C. § 203(a)(5) (grants executed on or after effective date of Act); § 304(c)(5) (grants executed before effective date of Act). In practice, courts have suggested that, in some circumstances, parties may mutually agree to contract around the termination right. *See* Milne v. Stephen Slesinger, Inc., 430 F.3d 1036 (9th Cir. 2005);  Penguin Group (USA), Inc. v. Steinbeck, 537 F.3d 193 (2d Cir. 2008); Michael J. Bales, Note, *The Grapes of Wrathful Heirs: Terminations of Transfers of Copyright and "Agreements to the Contrary,"* 27 CARDOZO ARTS & ENT. L.J. 663, 669 (2010).

[18]  H.R. REP. NO. 1476, *supra* note 14, at 124.

[19]  17 U.S.C. § 203(a)(4); H.R. REP. NO. 1476, at 124.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 5 of 32

3 Harv. J. of Sports & Ent. Law 55, *60

In general, termination is effected by serving an advance written notice upon the grantee or the grantee's successor in title, signed by all of those entitled to terminate the grant, [21] or by their duly authorized agents. [22] The notice must be served at least two years, but not more than ten years, before the effective date of termination stated in the notice, and a copy of the notice must be recorded in the Copyright Office before the effective date of termination. [23]

For grants executed on or after January 1, 1978, Section 203 of the Copyright Act applies. Section 203 gives authors and their statutory successors the right to terminate a qualifying grant any time during a five-year period, which begins to run thirty-five years after the grant's execution. If the grant covers the right of publication, the period begins at the end of **[*61]** thirty-five years from the date of publication, or at the end of forty years from the date of execution of the grant, whichever ends first. [24]

For grants of renewal term interests executed before January 1, 1978, Section 304(c) governs. Section 304(c) gives authors and their statutory successors the right to terminate the grant at any time during a five-year period that begins on January 1, 1978, or fifty-six years after the date statutory copyright was originally secured, whichever is later. [25] Section 304(d), which was added by Congress as part of the Sonny Bono Copyright Term Extension Act of 1998 (which increased the term of all subsisting copyrights by twenty years), provides a termination right for the extended twenty-year period to authors or successors whose original termination rights, under Section 304(c), had, as of October 26, 1998, expired without being exercised. Termination of the grants subject to Section 304(d) may be effected at any time during a period of five years, beginning at the end of seventy-five years from the date copyright was originally secured. [26]

Once termination is effected, the persons owning the termination interests (the author or his statutory successors) will own all rights provided by the Copyright Act with respect to the work that was subject to the grant, regardless of the particular termination statute that applies. There is, however, an important exception: any derivative works prepared under authority of the grant before its termination may continue to be utilized after termination. [27] This means, for example, that a screenwriter who has successfully terminated his assignment to a motion picture studio of the right to make films based on his or her screenplay may prevent the studio from making new motion pictures

---

[20] A detailed explanation of the mechanics of termination is 5 outside the scope of this article and has been covered extensively elsewhere. Indeed, the passage of the 1976 Copyright Act was followed almost immediately by a flurry of scholarly activity exploring the mechanisms governing these new rights. *See, e.g.,* Melville B. Nimmer, *Termination of Transfers Under the Copyright Act of 1976,* 125 U. PA. L. REV. 947 (1977); Marc R. Stein, *Termination of Transfers and Licenses Under the New Copyright Act: Thorny Problems for the Copyright Bar,* 24 UCLA L. REV. 1141 (1977); Benjamin Melniker & Harvey D. Melniker, *Termination of Transfers and Licenses Under the New Copyright Law,* 22 N.Y.L. SCH. L. REV. 589 (1976). *See also* Timothy K. Armstrong, *Shrinking the Commons: Termination of Copyright Licenses and Transfers for the Benefit of the Public,* 47 HARV. J. ON LEGIS. 359 (2010); Anthony Cheng, *Lex Luthor Wins: How the Termination Right Threatens to Tear the Man of Steel in Two,* 34 COLUM. J.L. & ARTS 261 (2011).

[21] 17 U.S.C. §§ 203(a)(1)-(2), 304(c)(1)-(2) (identifying heirs entitled to termination rights) (2006).

[22] 17 U.S.C. §§ 203(a)(4), 304(c)(4).

[23] 17 U.S.C. §§ 203(a)(4)(A), 304(c)(4)(A).

[24] "This alternative method of computation [was] intended to cover cases in which years elapse between the signing of a publication contract and the eventual publication of the work." H.R. REP. NO. 1476, at 126.

[25] 17 U.S.C. § 304(c)(3).

[26] 17 U.S.C. § 304(d)(2).

[27] 17 U.S.C. §§ 203(b)(1), 304(c)(6)(A).

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 6 of 32

3 Harv. J. of Sports & Ent. Law 55, *61

based on the screenplay, but cannot prevent the studio from exploiting any motion pictures created while the grant was in effect.

Grants executed prior to January 1, 1978 have been subject to termination for several decades, and the efforts to terminate such grants have been the subject of several high profile Circuit Court opinions. [28] The first generation of copyright transfers subject to Section 203 of the Copyright Act (i.e., all post-January 1, 1978 grants, which necessarily include all new works created after the 1976 Act went into effect) will begin entering their termination windows on January 1, 2013. [29] The period for providing notice of termination of such grants has already opened. Over the next several years, numerous grants in popular works are anticipated to become subject to termination. [30]

*C. The Special Role of the Work-for-Hire Doctrine in the Termination Analysis*

The termination provisions apply to any "transfer" of copyright, [31] including assignments, exclusive licenses, [32] and nonexclusive licenses. [33] While this covers a broad array of grants, the termination statutes expressly **[*63]** provide that a grant in a "work made for hire" is *not* subject to statutory termination under Section 203 or Section 304(c) of the Copyright Act. To understand fully the importance of this exception, and its implications in light of the manner in which most content in the entertainment industry is created and transferred, it is necessary to first explore the nature of works made for hire under both the 1909 and 1976 Copyright Acts.

1. Works for Hire Under the 1909 Act

The 1909 Copyright Act continues to govern works created prior to January 1, 1978, and, by extension, works made for hire during that period. The 1909 Act mentioned works for hire only in the definition section of the statute, which

---

[28]   *See, e.g.,* Milne v. Stephen Slesinger, Inc., 430 F.3d 1036 (9th Cir. 2005) (termination claim involving A.A. Milne's Winnie the Pooh); Penguin Group (USA), Inc. v. Steinbeck, 537 F.3d 193 (2d Cir. 2008) (termination claim brought by heirs of novelist John Steinbeck); Classic Media, Inc. v. Winifred Knight Mewborn, 532 F.3d 978 (9th Cir. 2008) (termination claim involving rights to Lassie).

[29]  This January 1, 2013 date is the date thirty-five years after the earliest possible date of execution of grants/transfers subject to the copyright termination mechanisms described in Section 203(a) of the Copyright Act. In practice, many grants of books, screenplays, and other creative works include the right of publication, and therefore will not be eligible for termination until thirty-five years have passed from the date of publication, which will often be up to several years after the date the grant was executed. 17 U.S.C. § 203(a)(3) (2006). In the event a work is not published within five years of the date the grant is executed, the grant may be terminated forty years from the date of execution. *Id.* at § 203(a)(3), 304(c)(4)(A).

[30]   *See generally supra* notes 4-6. *See also* Barnes & Cieply, *supra* note 3 (quoting Stanford Professor Paul Goldstein as opining that "[a]ny young lawyer starting out today could turn what [copyright termination specialist attorney Marc Toberoff is] doing into a real profit center" because "[a] new wave of copyright termination actions is expected to affect the film, music and book industries as more works reach the 56-year threshold for ending older copyrights, or a shorter period for those created under a law that took effect in 1978."); Eriq Gardner, *Copyright Battle Comes Home*, IP LAW & BUSINESS, LAW.COM (Oct. 8, 2009), http://www.law.com/jsp/cc/PubArticleCC.jsp?id=1202434372952.

[31]   17 U.S.C. §§ 203(a), 304(c) (2006).

[32]  A "transfer of copyright ownership" includes "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101.

[33]   17 U.S.C. §§ 203(a), 304(c). *See also* STAFF OF H. COMM. ON THE JUDICIARY, 89TH CONG. REP. ON COPYRIGHT LAW REVISION PART 6: SUPPLEMENTARY REP. OF THE REG. OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW 73 (H. Comm. Print 1965), ("Non-exclusive grants were included in the right on the strength of the argument that, otherwise, there would be nothing to prevent a transferee from avoiding the effect of the [termination] provision by compelling the author to grant him a perpetual non-exclusive license along with a statutorily limited transfer of exclusive rights.").

Case 7:22-cr-00560-CS    Document 30-2    Filed 05/31/24    Page 7 of 32

3 Harv. J. of Sports & Ent. Law 55, *63

provided that "[i]n the interpretation and construction of this title . . . the word 'author' shall include an employer in the case of works made for hire." [34] Neither the term "employer" nor "work for hire" was defined by the 1909 Act, leaving courts to determine the contours of the concept.

Throughout much of the life of the 1909 Act, courts applied the workf-or-hire doctrine only to "traditional" [35] hierarchical relationships in which the employee created the work as part of "the regular course of business" of the employer. [36] During the last decade that the 1909 Act was in effect, courts expanded the concept to include less traditional relationships, as long as the work was made at the hiring party's "instance and expense," [37] and the hiring party had the right to "direct or supervise" the artist's work. [38]

Even under this broader conception, however, when interpreting the 1909 Act, courts looked to the actual relationship between the hiring and hired parties to determine whether a copyrighted work was created within **[*64]** the course of a true employment relationship. Where a putative employer had no right to direct, supervise or control his "employee," no employment relationship existed, notwithstanding the parties' use of the word "employment" in a contract governing the relationship. [39] Likewise, a putative employee's dominant role in the corporation, his freedom to engage in profitable outside activities without sharing the proceeds with the "employer," and the absence of any fixed salary weighed against a finding that the hired party was a true employee. [40]

The clearest application of this principle can be found in the Second Circuit's opinion in *Marvel Characters, Inc. v. Simon.* [41] In *Marvel Characters*, comic book writer and artist Joe Simon sought to terminate his transfer (to the predecessors-in-interest of Marvel Comics) of the copyrights for the iconic Captain America character and his earliest adventures. [42] However, in a 1969 settlement agreement to an earlier dispute between the parties, Simon acknowledged that his contribution to the Captain America character and comics "was done as an employee for hire of [Marvel's predecessor]." [43] Relying on that acknowledgment, Marvel filed for a declaratory judgment that Simon's termination notices were invalid, and the Southern District of New York granted summary judgment in Marvel's favor. [44] The lower court determined that, based on the language in the 1969 settlement agreement, the

---

[34] 1909 Act at § 62.

[35] Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 749 (1989).

[36] Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 206 F.3d 1322, 1327 (9th Cir. 2000) (quoting MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 5.03[B][1][a][i] (1999)).

[37] *See* Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965) (applying work for hire doctrine for where individual was commissioned to produce a work as an independent contractor); Brattleboro Publ'g Co. v. Winmill Publ'g Corp., 369 F.2d 565, 567-68 (2d Cir. 1966) (independent contractor is an "employee" and a hiring party is an "employer" for purposes of the work-for-hire statute if the work is prepared at the hiring party's "instance and expense").

[38] *See* Donaldson Publ'g Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639, 643 (2d Cir. 1967); Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir. 1972).

[39] Donaldson, 375 F.2d at 641-43.

[40] *Id.*

[41] 310 F.3d 280, 291 (2d Cir. 2002) (quoting MELVILLE B. NIMMER & DAVID NIMMER, § 11.02[A][2] (2000 ed.)).

[42] Id. at 282-84.

[43] Id. at 284.

[44] Id. at 285.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 8 of 32

3 Harv. J. of Sports & Ent. Law 55, *64

Captain America copyrights fell within the work-for-hire exception to copyright termination under Section 304(c) of the Copyright Act.  [45]  The Second Circuit reversed, holding that "an agreement made after a work's creation stipulating that the work was created as a work for hire constitutes an 'agreement to the contrary' which can be disavowed pursuant to the statute."  [46]  The court noted that, in assessing work-for-hire status, "[i]t is the relationship that in fact exists between the parties, and not their description of that relationship, that is determinative."  [47]  The Second Circuit therefore remanded to the lower court for trial on the issue of whether the Captain America stories were, in fact, created as works for hire (and therefore **[*65]**  whether Simon had the right to terminate).  [48]  The Second Circuit's ruling and rationale in *Marvel Characters* remains one of the most comprehensive and widely adopted statements of the law governing contractual agreements and works for hire under the 1909 Act. Simply stated, parties may not engage in an after-the-fact characterization in order to avoid the prospect of statutory termination.

2. Works for Hire Under the 1976 Act

Unlike the previous 1909 Act, the 1976 Copyright Act, which governs works created on or after January 1, 1978, explicitly defines "work made for hire." To qualify as a work made for hire under the 1976 Act, the work must either be: (1) "prepared by an employee within the scope of his or her employment," or (2) be one of certain enumerated works that are specially ordered or commissioned, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.  [49]

*a. Works for Hire Created By Employees*

If a hired party is determined to be an employee, the copyright in a work created within the course and scope of the employment relationship **[*66]**  will be considered a work made for hire.  [50] Like the 1909 Act, the 1976 Act did not define the term "employee." In *Community for Creative Non-Violence v. Reid*, however, the Supreme Court unanimously ruled that Congress intended to invoke common law agency principles to determine whether the hired party is an "employee" for purposes of the Copyright Act.  [51]  The Court's inquiry in *Reid* focused on the hiring

---

[45]  Id. at 284-85.

[46]  Id. at 290.

[47]  *Id.* (quoting NIMMER & NIMMER, *supra* note 41, § 11.02[A][2]).

[48]  Id. at 293.

[49]  The full definition of a "work made for hire" under the 1976 Copyright Act is:

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

17 U.S.C. § 101 (2006).

[50]  *Id.*

[51]  490 U.S. 730, 751 (1989).

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 9 of 32

3 Harv. J. of Sports & Ent. Law 55, *66

party's right to control the "manner and means" by which the copyrighted work was accomplished. [52] Under the Court's test, for the hired party to be considered an "employee," the hiring party must have control over the *process* by which the product was created. The right to control the work product is not solely determinative of employment. [53]

To aid its inquiry into employment status, the Court enumerated an illustrative list of factors, including: (1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the hired party; (6) the extent of the hired party's discretion over when, and for how long, to work; (7) the method of payment; (8) the hired party's role in hiring and paying assistants; (9) whether the work is part of the regular business of the hiring party; (10) whether the hiring party is in business; (11) the provision of employee benefits; and (12) the tax treatment of the hired party. [54]

While the Supreme Court in *Reid* counseled that "[n]o one of these factors is determinative," [55] subsequent cases have accorded certain factors greater weight than others. [56] Indeed, in *Aymes v. Bonelli*, the Second Circuit **[*67]** accorded particular weight to five out of twelve factors: "(1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party." [57] Of those, the *Aymes* court suggested that consideration of only two of the factors -- employee benefits and the tax classification of the hired party -- would be "highly indicative" of whether a hired party should be considered an employee or, conversely, an independent contractor. [58] Later cases have avoided narrowing the list of relevant factors as far as the *Aymes* court did, but have validated the focus, at least in the copyright context, on the five factors initially enumerated in *Aymes.* [59]

*b. Works for Hire Created By Independent Contractors*

---

[52]  Reid, 490 U.S. at 751.

[53]  Id. at 741.

[54]  Id. at 751-52.

[55]  Id. at 752.

[56]  *See, e.g.*, Langman Fabrics v. Graff Californiawear, Inc., 160 F.3d 106, 110-11 (2d Cir. 1998) ("Not all the *Reid* factors will be significant in every case, and we must weigh in the balance only those factors that are actually indicative of agency in the particular circumstances before us."); Marco v. Accent Publ'g Co., 969 F.2d 1547 (3d Cir. 1992) (holding that photographer was an independent contractor while ignoring some *Reid* factors and noting that some were "indeterminate" and should not be considered); MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769 (3d Cir. 1991) (holding that a computer programmer could be an independent contractor without addressing several of *Reid* factors); M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486 (11th Cir. 1990) (holding that a drafting service operated as an independent contractor to a builder based on only eight factors, ignoring others).

[57]  980 F.2d 857, 861 (2d Cir. 1992).

[58]  Id. at 862-63.

[59]  *See, e.g.*, Martha Graham Sch. & Dance Found. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 636 n.21 (2d Cir. 2004); Langman Fabrics, 160 F.3d at 110-11; Price v. Fox Entm't Group, Inc., 473 F. Supp. 2d 446, 456 (S.D.N.Y. 2007) (referring to the list of five factors highlighted by *Aymes* as the " *Reid-Aymes* factors"); *Cf.* Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 115-16 (2d Cir. 2000) (declining to adopt *Aymes* court's weighing of *Reid* factors in assessing employee status for purposes of Title VII discrimination claim).

If the hired party is determined to be an independent contractor, the work will only be considered a work made for hire if it falls within one of the categories of qualifying "specially ordered or commissioned" works set forth in Section 101 of the Copyright Act. [60] Even then, the parties must agree, in a writing signed by both parties, that the work shall be considered a "work made for hire." [61] Courts have generally refused to require that any specific words be used in such a writing (not even the term "work for hire" need appear), although it must appear from the document that the parties [*68] both intended that the work be considered a work for hire. [62] So long as this intent exists prior to the work's creation, many courts have held that the writing evidencing this agreement may be executed after the work is created. [63]

If the work does not fall within one of the enumerated categories set forth in Section 101, however, it will not qualify as a work for hire unless the hired party was an employee of the hiring party. [64] Two notable examples of non-qualifying works are photographs [65] and sound recordings. [66] Unless they qualify as "contributions to a collective work" (or, perhaps, if they can be pigeonholed into another category in the statute's enumerated list [67]), such works created by independent contractors would not qualify as works for hire, notwithstanding any agreement between the hiring party and the commissioned party purporting to treat them as such.

[*69] 3. Works for Hire and Copyright Termination

The House Report to the 1976 Act expressly notes that one of the principal reasons the definition of the term "works made for hire" assumed importance in the Act's development was because the right of termination would not apply to such works. [68] This decision was one of the primary means by which Congress sought to strike an appropriate

---

60   17 U.S.C. § 101 (2006). Of primary importance to the entertainment industry, Section 101 identifies works that are commissioned "as a part of a motion picture or other audiovisual work" -- which would encompass contributions from screenwriters, directors, cinematographers, composers, actors, or virtually anyone else involved in the production of a motion picture -- as eligible for work-for-hire status.

61   *Id.*; May v. Morganelli-Heumann & Assocs., 618 F.2d 1363, 1368-69 (9th Cir. 1980).

62   Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1141 (9th Cir. 2003).

63   Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 559 (2d Cir. 1995) (while parties cannot retroactively agree to render a work a work for hire, they may create the written memorialization of such an agreement after the fact); Compaq Computer Corp. v. Ergonome Inc., 210 F. Supp. 2d 839 (S.D. Tex. 2001) (noting that "[t]he Fifth Circuit has deemed the Second Circuit to be 'the *de facto* Copyright Court of the United States' " and following *Playboy Enters., Inc. v. Dumas*) (quoting Easter Seal Soc. for Crippled Children and Adults of La., Inc. v. Playboy Enter., 815 F.2d 323, 325 (5th Cir. 1987)). *But see* Schiller & Schmidt v. Nordisco Corp., 969 F.2d 410, 412-13 (7th Cir. 1992) (holding the opposite).

64   Reid, 490 U.S. at 741 ("Section 101 plainly creates two distinct ways in which a work can be deemed for hire: one for works prepared by employees, the other for those specially ordered or commissioned works, which fall within one of the nine enumerated categories and are the subject of a written agreement.").

65   SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 312 (S.D.N.Y. 2000) ("[P]hotographs are not included in the § 101 list of subject matters permitting a work-for-hire agreement with independent contractors."); R. Scott Miller, Jr., *Photography and the Work-for-Hire Doctrine*, 1 Tex. Wesleyan L. Rev. 81, 103102 (1994).

66   For a more detailed discussion, see, e.g., Mary LaFrance, *Authorship and Termination Rights in Sound Recordings*, 75 S. CAL. L. REV. 375, 378-90 (2002). The serious practical consequences of this exclusion, as it relates to copyright termination in particular, has also been the subject of analysis and discussion. *See* David Nimmer & Peter S. Menell, *Sound Recordings, Works for Hire, and the Termination-of-Transfers Time Bomb*, 49 J. COPYRIGHT SOC'Y U.S.A. 387 (2001).

67   *See* SHL Imaging, Inc., 117 F. Supp. 2d at 312.

68   H.R. REP. NO. 94-1476, at 125 (1976).

Case 7:22-cr-00560-CS  Document 30-2  Filed 05/31/24  Page 11 of 32

3 Harv. J. of Sports & Ent. Law 55, *69

balance between the rights of artists and producers/employers. Congress evidently reasoned that the employers or commissioning entities of genuine works for hire (presumably) had meaningfully contributed resources and/or facilities towards the works' creation, and were therefore entitled to reap the benefits of that investment for the full life of the resulting copyrights. In contrast, such protection would not be afforded to entities that merely acquired creative works that had been generated through the efforts and investment of artists working without their support.

The interminable status of works for hire also follows from the 1976 Act's explicit recognition that copyright vests initially in the author or authors who created the work.  [69] In the case of works for hire, however, the employer or person for whom the work was prepared, not the individual who created the work, is considered the author from inception.  [70] Because only authors and their specified heirs may terminate copyright transfers, the legal fiction of the work-for-hire doctrine ensures that neither the actual creator of the work nor his heirs will ever possess termination rights.

The practical consequences of a work's characterization thus become clear: if a writer assigns his or her post-January 1, 1978 copyright in a screenplay to a studio, he or she may terminate this grant as early as thirty-five years later. If, on the other hand, the screenwriter is determined to be an "employee" of the studio, or if the studio has commissioned the writer to prepare the screenplay on its behalf, the studio is deemed to be the author of a screenplay as a work made for hire, and the statutory termination provisions will never apply. Work-for-hire agreements are extremely common in the entertainment industry,  [71] and the many works created by studio employees **[*70]** in the scope of their employment, or by specially commissioned screenwriters, will never be subject to statutory termination.

This loss of termination rights seemingly should not come into play with respect to preexisting works of freelance writers, directors and other artists created prior to entering into a relationship with a studio or production company. While studios will often attempt to characterize such preexisting works as having been made for hire,  [72] the absence of an agreement made contemporaneously with the work is likely to defeat the studio's characterization should a dispute arise. Perhaps recognizing this fact, studios routinely insert "belt and suspenders" language in their contracts with screenwriters, providing that if the work being acquired is for any reason not deemed to be a work for hire, the writer will also convey his rights in the work via an assignment.  [73] Such assignment language

---

[69]  17 U.S.C. § 201(a) (2006).

[70]  17 U.S.C. § 201(b).

[71]  See generally GENEVIEVE JOLLIFFE & CHRIS JONES, THE GUERILLA FILM MAKER'S HANDBOOK 123 (2004) (advising filmmakers to "have work-for-hire agreements with anyone on your crew that makes a creative contribution that could be copyrightable"); HARVEY RACHLIN, THE TV AND MOVIE BUSINESS: AN ENCYCLOPEDIA OF CAREERS, TECHNOLOGIES, AND PRACTICES 332 (1991) (explaining significance of work-for-hire contractual arrangements in the entertainment industry); RANDALL D. WIXEN, THE PLAIN AND SIMPLE GUIDE TO MUSIC PUBLISHING 23 (2005) (noting that, in the world of music, "[w]ork-for-hire agreements are most common in film and television composing, where the studio wants to own and control the whole collaborative result and not have to keep checking with the owners of the incorporated elements").

[72]  See Michael H. Davis, The Screenwriter's Indestructible Right to Terminate Her Assignment of Copyright: Once a Story is "Pitched," a Studio Can Never Obtain All Copyrights in the Story, 18 CARDOZO ARTS & ENT. L.J. 93, 114 (2000).

[73]  See id. See also Alexander Lindey, LINDEY ON ENTERTAINMENT, PUBL. & THE ARTS § 6:33 (3d ed. 2009) ("All material written under this agreement (the 'Material') constitutes work that is a contribution to a motion picture or other audio visual work under this agreement, and accordingly shall be deemed to be a work made for hire for Producer. Producer shall be considered the author of the Material for all purposes and the sole and exclusive owner of all copyrights, patents, trademarks, and all other right, title, and interest in and to the Material and each and every part of it, including all incidents, plots, dialogue, characters, action, and titles forming a part of the Material. Writer will, upon request, execute, acknowledge, and deliver to Producer such additional documents as Producer may deem necessary to effectuate Producer's rights under this agreement, and Writer hereby

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 12 of 32

3 Harv. J. of Sports & Ent. Law 55, *70

does ensure, at least initially, that the studio becomes the owner of all preexisting works upon which a hit film is based. Unlike a work made for hire, however, a mere assignment will be subject to statutory termination. This means that while a studio may own the copyright in perpetuity for a film or other derivative work based on a preexisting screenplay, the writer could retain the ability to terminate rights in the screenplay itself, or at the very least, in whatever underlying notes or materials the writer had already prepared before committing **[*71]** his or her ideas to a more fully fleshed-out form. [74] Upon recapturing these rights, the writer or his heirs would have the exclusive right to create new films and other derivative works based on the screenplay or underlying materials. [75]

However, many artists could nevertheless be unwittingly deprived of their valuable termination rights, by creating their works while nominally employed by their own single-employee loan-out corporations. As discussed in greater detail below, the 1976 Copyright Act's copyright termination provisions create an interesting irony: the law prevents studios or producers from using draconian agreements to divest artists of their valuable termination rights. Yet many artists may inadvertently suffer the same fate at their own hands, simply by using a corporate structure created by, for, and with the sole purpose of *benefitting* the artist.

## III. THE UNFORESEEN CHALLENGES OF LOAN-OUT CORPORATIONS

In principle, copyright termination rights should function in a straightforward manner. The mechanics of copyright termination are **[*72]** spelled out clearly by the Copyright Act itself, while the work-for-hire doctrine, a commonly used and understood concept in the entertainment industry and a well-entrenched and widely litigated legal doctrine, serves to limit the scope of copyrighted works and transfers that are eligible for termination. Yet few people seem to realize that this seemingly simple scheme has been complicated dramatically, and perhaps even undermined altogether, by artists' widespread use of so-called "loan-out corporations."

*A. What Is a Loan-Out Corporation*?

A loan-out corporation is a legal fiction employed for the financial benefit of successful artists and entertainers. It is a duly organized corporation, typically wholly owned by an artist, the sole function of which is to "loan out" the services of the artist-owner to producers and other potential employers. [76] Loan-out arrangements typically involve

---

grants to Producer the right, as its attorney-in-fact, to execute, acknowledge, deliver, and record in the U.S. Copyright office or elsewhere any and all such documents. In the event that the work is deemed to not be a work made for hire, writer hereby assigns all right, title, and interest in and to said work to Producer.") (writing services agreement).

[74]   *See* Davis, *supra* note 72, at 109 ("[S]creenwriters who show up at the producer's office with preexisting work -- whether it be a pitch written on note cards, an outline, or a treatment -- can certainly produce a future work as a specially commissioned work that will not be subject to a termination right as a work for hire. However, the pitch, outline, or treatment itself will never be a work for hire, and will always be subject to the author's termination right.").

[75]  A "mutual block" scenario could arise, depending on how closely the eventual production, based on the screenwriter's original concept or screenplay, actually resembled the underlying materials:

[I]n theory, any number of spinoffs, sequels, or character developments are possible. This is because although the derivative work is safe from the author's termination rights, to the extent that the underlying preexisting work was well-developed and to the extent that the derivative work is truly based upon the underlying work, the author, having regained copyright in that work, has the right to create, or license others to create, new derivative works based on the original work. On the other hand, there will no doubt be severe, perhaps even fatal, limits upon the author's freedom to exploit the underlying work to the extent that the prepared derivative work(s) adopted new character names, a new title, and, especially, to the extent new matter was added. A canny producer might succeed in limiting the author's freedom by creating during the rewrite process names, titles, and other matter to which public recognition attaches. Such new expressive features, created within the work-for-hire relationship, become parts of the specially commissioned work for hire.

*Id.* at 98-99.

[76]  For more detailed descriptions of the nature and function of loan-out corporations, see, e.g., George G. Short, *The Loan-Out Corporation in Tax Planning for Entertainers*, 44 LAW & CONTEMP. PROBS. 51, 51 (1981); Marilyn Barrett, *Independent*

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 13 of 32

3 Harv. J. of Sports & Ent. Law 55, *72

two primary contractual relationships: (1) an agreement between the artist and his wholly owned corporation by which the artist agrees to provide services to that corporation, often exclusively, in exchange for a fixed or contingent salary; and (2) an agreement between the loan-out corporation and a producer or other employer to furnish the artist's services to said producer for a given project. [77]

Loan-out corporations offer two primary benefits to the artists who use them: limited personal liability and beneficial tax treatment. By contracting through a separately organized corporation, artists are able to limit their liability to the corporation's assets, and avoid personal liability that might otherwise arise out of the corporation's dealings. Despite the fact that an artist and his loan-out corporation are effectively one and the same, the distinction is nevertheless meaningful. In one widely publicized case, actress Kim Basinger successfully appealed an $ 8 million breach of contract judgment against her because the court had relied on a special verdict finding **[*73]** that Basinger "and/or" her loan-out corporation were liable for the breach (as opposed to a specific finding as to Basinger individually). [78]

More fortunate artists will never have to avail themselves of such limited liability, but can nevertheless achieve significant tax savings by using loan-out corporations. Artists who pass their income through loan-out corporations may enjoy better liquidity/cash flow, can coordinate their income distribution by fiscal year, enjoy lower corporate tax rates, and can further shield themselves from taxes by using qualified pension, profit-sharing, and employer medical reimbursement plans. [79] The Internal Revenue Service, however, is well aware of the tax-shielding properties of loan-out corporations. Indeed, it has engaged in a decades-long game of cat-and-mouse with artists (and their tax attorneys), revising the tax code and periodically stepping up tax enforcement efforts in an effort to reclaim much of the revenue that loan-out corporations have allowed artists to retain. [80]

*B. Loan-Out Corporations in the Courtroom*

Loan-out corporations and the legal battles they create date back at least as far as the 1930s. In 1938, Fontaine Fox, a prominent and celebrated cartoonist of the era, clashed with the IRS, which had disregarded his loan-out corporation as a mere dummy and claimed that Fox's income had been improperly assigned to the corporation. [81] Fox ultimately prevailed before the Board of Tax Appeals, the predecessor to today's U.S. Tax Courts. [82] The next year, stage and film actor/screenwriter/producer/director Charles Laughton successfully fended off a similar IRS challenge to his use of a loan-out corporation. [83] Over the years that followed these early cases, the IRS **[*74]**

---

*Contractor/Employee Classification in the Entertainment Industry: The Old, the New and the Continuing Uncertainty*, 13 U. MIAMI ENT. & SPORTS L. REV. 91, 108 (1995); Mary LaFrance, *The Separate Tax Status of Loan-Out Corporations*, 48 VAND. L. REV. 879, 880-83 (1995); Robert A. Cohen, *To Incorporate or Not to Incorporate? That Is the Question*, 2 TEX. REV. ENT. & SPORTS L. 113, 114 (2001).

[77]   Short, *supra* note 76, at 51.

[78]   Main Line Pictures, Inc. v. Basinger, No. B077509, 1994 WL 814244, at *1 (Cal. Ct. App. 1994). The lessons learned by the industry from this case, however, may have substantially undermined the limited liability benefits of loan-out corporations in the long run: savvy studios and producers now routinely demand the artists personally guarantee the obligations of their loan-out corporations.

[79]   Short, *supra* note 76, at 52-65; LaFrance, *supra* note 76, at 883-904; Cohen, *supra* note 76, at 118-26.

[80]   DANIEL SANDLER, THE TAXATION OF INTERNATIONAL ENTERTAINERS AND ATHLETES: ALL THE WORLD'S A STAGE 158-61 (1995); Kathryn Michaelis, *IRS Tightens Grip on Hollywood Deductions*, 6 DEPAUL-LCA J. ART & ENT. L. 178, 178 (1995); SCHUYLER M. MOORE, TAXATION OF THE ENTERTAINMENT INDUSTRY 115-16 (9th ed. 2008); Short, *supra* note 76, at 65-74; Barrett, *supra* note 76, at 8-14; LaFrance, *supra* note 76, at 904-54; Cohen, *supra* note 76, at 127-32.

[81]   Fox v. Comm'r, 37 B.T.A. 271 (1938).

[82]   *Id.*

[83]   Laughton v. Comm'r, 40 B.T.A. 101 (1939).

Case 7:22-cr-00560-CS    Document 30-2    Filed 05/31/24    Page 14 of 32

3 Harv. J. of Sports & Ent. Law 55, *74

and the courts have remained at odds with respect to the legitimacy of the loan-out corporations (and the associated beneficial tax treatment enjoyed by those who use them).

The IRS first successfully attacked loan-out corporations in Sargent v. Commissioner, 93 T.C. 572 (1989), a case in which the Service challenged the use of loan-out corporations by two hockey players for the National Hockey League's Minnesota North Stars. North Stars players Gary Sargent and Steven Christoff had contracted with their club via "personal services corporations" (or "PSCs"). Applying the common law definition of "employer and employee", the U.S. Tax Court found that the players were not truly employees of their PSCs, but of the club itself, which (through the team's coach) controlled the players' on-ice services; as a result, the Tax Court disallowed deductions taken by the players for pension plan contributions. [84]

The IRS's victory, however, was short-lived. The Eighth Circuit reversed, holding that, for a loan-out corporation to be deemed a true controller of the service-providing individual: (1) the service provider must be "an employee of the loan-out corporation, whom the corporation has the right to direct or control in some meaningful sense" and (2) there must exist between the loan-out corporation and the service recipient "a contract or similar indicia recognizing the loan-out corporation's controlling position." [85] The court went on to uphold the legitimacy of the hockey players' loan-out arrangements, and the bona fide status of the players as employees of their respective PSCs. Among other things, it relied on the bona fide contracts between the players and their PSCs and the PSCs and the North Stars club, as well as the recognition accorded to the arrangement by the club, the NHL, and the Minnesota Office of Administrative Hearings. [86] The IRS, however, was undeterred, stating in a 1991 Action on Decision that, in other circuits, it would not follow the Eighth Circuit's holding in Sargent. In doing so, the IRS signaled that it intended to continue to aggressively pursue taxes from loan-out arrangements like that in Sargent. [87]

 [*75]  The IRS made good on that promise a few years later, bringing an action against Houston Rockets guard Allen Leavell for taxes from revenues paid by the club to his loan-out corporation. [88] Acknowledging the Eighth Circuit's previous decision in Sargent, the Tax Court dismissed that court's reasoning as being too focused on the contracts presented by the players, noting,

> [w]hile we agree that contract terms are important in determining whether a personal service corporation is to be recognized as the true employer of the individual service provider, we do not believe that the mere existence of such terms in a contract is sufficient when the reality of the relationship is otherwise. [89]

Considering Leavell's personal guarantee of the contract between his loan-out and the Rockets club, as well as the authority of both the Rockets and the National Basketball Association to directly control Leavell's services (by, for example, taking disciplinary action, such as leveling fines and suspensions), the Tax Court concluded that Leavell was an employee of the Houston Rockets, and the income paid to his loan-out should be imputed to him personally. [90]

---

84   Sargent v. Comm'r, 93 T.C. 572 (1989).

85   Sargent v. Comm'r, 929 F.2d 1252, 1256 (8th Cir. 1991).

86   Id. at 1260. Not everyone was as convinced. In a dissenting opinion, the Eighth Circuit's Judge Arnold observed, "The idea that the coach issued orders to Sargent and Christoff in their capacity as corporate officers, which orders they then relayed to themselves as corporate employees, is fanciful." Id. at 1261 (Arnold, J., dissenting).

87   Sargent v. Comm'r, 929 F.2d 1252, 1256 (8th Cir. 1991), action on dec., CC-1991-022 (Oct. 22, 1991); Marilyn Barrett, Loan-Out Corporations, CEB CALIFORNIA CAL. BUS. LAW REPORTER 125, 125-28. (1995).

88   Leavell v. Comm'r, 104 T.C. 140 (1995).

89   Id. at 154.

90   Id. at 157-59.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 15 of 32

3 Harv. J. of Sports & Ent. Law 55, *75

Outside of the world of the U.S. Tax Courts, however, judges have shown much greater inclination to respect loan-out arrangements. For example, the Ninth Circuit has gone so far as to hold that a doctor was an employee of his own loan-out corporation even where "[t]here is no documentary evidence in the record demonstrating that [the doctor] is an employee of [his loan-out] or that [the loan-out] has the right to control the activities of [the doctor]." [91]

Yet despite the ever-present risk of scrutiny from tax authorities, in the more than seventy years since Fontaine Fox and Charles Laughton first tangled with the IRS, loan-out corporations have achieved near-ubiquity in the entertainment industry: they have been broadly adopted by talent in multiple fields and are even a regular topic in mass-market entry-level texts about the industry. [92]

**[*76]**   *C. Loan-Out Corporations and Copyright Termination*

Typically, the agreement between an artist and his loan-out corporation provides that the results and proceeds of the artist's services are "works made for hire" for the corporation, and are therefore owned by the loan-out corporation. For example, an employment agreement between artist and loan-out may provide:

> (b) Artist hereby grants, transfers and assigns to Corporation, and Corporation shall be entitled to and shall own solely and exclusively, forever, without limitation and for all purposes, each, every and all rights and interests of any and every kind and character whatsoever in and to all of the results and proceeds of Artist's services hereunder. . . .

> (e) To the extent that the work is considered: (i) contributions to collective works and/or (ii) as parts or components of audio-visual words [*sic*], the parties hereby expressly agree that the work shall be considered 'works made for hire' under the United States Copyright Action [*sic*] of 1976, as amended (17 U.S.C. § 101 *et seq.*). In accordance therewith, the sole right of copyright in and to the work shall be the sole and exclusive property of Corporation in perpetuity. To the extent that the work is deemed works other than contributions to collective works and/or parts or components of audio-visual works, Artist hereby assigns to Corporation all rights, title and interest in and to the copyrights of such work and all renewals and extensions of the copyrights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries. Artist shall execute, verify, acknowledge, deliver and file any and all formal assignments, recordation and any and all other documents which Corporation may prepare and reasonably call for to give effect to the provisions of this Agreement. [93]

There are two primary reasons why artists choose to deem the results and proceeds of their work a "work made for hire" for their loan-out corporation. First, a producer who enters into an agreement with an artist's loanout corporation looks to the corporation for the same broad grant of rights the producer would otherwise seek from the artist directly. Consequently, **[*77]** the loan-out corporation must acquire all rights to the artist's services in order to convey them to the producer. Second, in order to avoid a challenge by the IRS on the basis that the loan-out corporation is a mere sham, the artist's employment agreement with the corporation must involve a facially legitimate exchange of rights and services for appropriate compensation.

---

[91]  Idaho Ambucare Cent. Inc. v. United States, 57 F.3d 752, 755 (9th Cir. 1995).

[92]  *See generally* RICHARD SCHULENBERG, LEGAL ASPECTS OF THE MUSIC INDUSTRY: AN INSIDER'S VIEW 338-41 (Robert Nirkind et al. eds., 1999); DINA APPLETON & DANIEL YANKELEVITS, HOLLYWOOD DEALMAKING: NEGOTIATING TALENT AGREEMENTS 125 (2002); GAIL RESNIK & SCOTT TROST, ALL YOU NEED TO KNOW ABOUT THE MOVIE AND T.V. BUSINESS 200-01 (1996).

[93]  Cohen, *supra* note 76, at 142-44 (rights language drawn from sample "Employee Loan-out Agreement" prepared by practicing California attorney). Note that this language first assigns all results and proceeds, then specifies that, to the extent possible, the results and proceeds shall be considered "works made for hire," and then again assigns all results and proceeds not captured within the "work made for hire" designation. While such language is, strictly speaking, redundant, such a "belt and suspenders" approach is typical of contractual rights language employed in the entertainment industry.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 16 of 32

3 Harv. J. of Sports & Ent. Law 55, *77

Notably, not all such agreements necessarily rely expressly on the "work made for hire" approach. For example, one prominent treatise offers a form that relies solely on assignment language without express reference to the work-for-hire doctrine. [94] Even in the absence of express work-for-hire language, however, the employee-employer relationship between an artist and his or her loan-out corporation would still likely give rise to an inference that the results and proceeds of the artist-employee's services are a "work made for hire" for the corporation. [95] For example, in the only published case to address the subject, the Second Circuit held that several ballets choreographed by well-known dancer-choreographer Martha Graham while Graham was affiliated with her own Center were, in fact "works made for hire" (under both the 1909 and 1976 Copyright Acts) and were therefore owned by the Center. [96]

Ironically, however, the very rights arrangement by which artists make their loan-out corporations effective and legitimate also potentially destroys **[*78]** their copyright termination rights. This is because, under Section 203(a) of the Copyright Act, as works made for hire, the works created by artists for their loan-out corporations are apparently rendered ineligible for copyright termination. [97] As Mary LaFrance explains, regarding the recording industry:

> [M]any of the performers who have made the greatest contributions to sound recordings may already have forfeited their termination rights in those recordings. Those recording artists who render their services through loan-out corporations are in fact employees of those corporations, and any performances they render in that capacity are already works made for hire. When the loan-out corporation contracts with a record label to "lend" the performer's exclusive services in carrying out the recording contract, the artist is creating a work made for hire as an employee of the loan-out, which is, therefore, the author of the artist's contribution to the recording. The loan-out assigns its copyright interest to the record label, although it remains the author. Because the recording is already a "work made for hire" under the "employee" prong of the [Copyright Act Section] 101 definition, however, the recording artist's contribution to the work is now completely ineligible for termination rights, which do not apply to any works created as works made for hire. Thus, when an artist performs on a sound recording as a loan-out employee, neither the artist nor his or her loan-out corporation has any termination rights in that recording. [98]

---

[94]   *See* DONALD C. FARBER & PETER A. CROSS, ENTERTAINMENT INDUSTRY CONTRACTS, Form 7-1, P 11 (2009) ("Employee hereby grants, transfers and sets over to Corporation, and Corporation shall be entitled to and shall own solely and exclusively, forever and without limitation and for all purposes, each and every and all rights and interests of any and every kind and character whatsoever in and to all of the results and proceeds of Employee's services hereunder."). Notably, however, the commentary to this form observes that "[w]hen such clauses are included in lending agreements with production companies, the purpose of the provision is to ensure that the production company obtains all the fruits of the employee's labors for which it is paying" and that "the grant of rights by the employee to loan-out corporation must encompass all rights which the production company may require," and suggests that the results and proceeds of the artist's services under the loan-out agreement represent a work made for hire. *Id.* at Form 7-1, Comment to P 11, n.4 (citing to Nimmer's discussion of works made for hire).

[95]   *See infra* Part IV.B.2.

[96]   Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 639-42 (2d Cir. 2004). The court's decision was based, in large part, on a detailed analysis of the precise agreement between Graham and the Center -- for instance, the court found that works created during an earlier period when Graham's contractual obligations to the Center were less intensive were *not* works for hire, in part because the contract in effect at that time made no reference to choreography as being within the scope of Graham's duties. Id. at 637-39.

[97]   *See supra* Section II.C.1.

[98]   LaFrance, *supra* note 66, at 403-04. Interestingly, LaFrance suggests that artists who wish to preserve their copyright termination rights (albeit at the expense of *some* tax benefits) replace their loan-out corporations with limited liability companies ("LLCs"); by this arrangement, LaFrance says, "[t]he artist can then function as an independent contractor rather than an employee, but the LLC structure will still provide limited liability." *Id.* at 404 n.108. Such options are discussed in greater detail in Part V, *infra*. While this approach may represent a potential "best practices" suggestion for future artists, however, it offers little

3 Harv. J. of Sports & Ent. Law 55, *78

The few commentators who have addressed this question, although declining to delve deeply into the underlying legal issues, have reached conflicting conclusions. Citing the *Martha Graham* case, Daniel Gould agrees with Mary LaFrance in concluding that artists who use loan-out corporations "cannot regain their works under § 203, solely because of the presence of an intermediary party, even though that party is a corporation of which they are sole owner." [99] At least one other commentator, Michael H. Davis, is **[*79]** decidedly more optimistic, reasoning that while the employer-employee relationships embodied in loan-out arrangements are sufficient to satisfy the tax code, they do not meet the more rigorous common law agency rules articulated by *Reid*, and therefore do not cause artists to lose their termination rights. [100]

In any event, there is no question that, on their face, the employer-employee relationships created in loan-out situations appear to render artists and writers' creative efforts works for hire. And the Second Circuit's decision in the *Martha Graham* case indicates that courts are willing to so find, even where the consequences are both potentially antithetical to sound creative arts policy and contrary to the express wishes of the artist or his or her estate. [101]

*D. Why Should We Care*?

Although there are no official statistics on the proportion of artists who rely on loan-out corporations, their widespread use in the entertainment industry suggests that a sizable percentage -- perhaps even a majority -- of artists may have inadvertently forfeited their copyright termination rights. [102] If this is the case, one of the significant policy tenets enshrined in the 1976 Copyright Act will be substantially undermined, likely contrary to Congressional intent. [103] In fact, nothing in the legislative record indicates **[*80]** that Congress ever discussed or contemplated the impact that loan-out corporations, and the work-for-hire status of works created thereunder, might have on artists' termination rights. Moreover, *Martha Graham* notwithstanding, at least one court (applying the 1909 Act) has demonstrated a reluctance to construe an artist's involvement with his own closely held corporation so as to destroy valuable statutory rights under the Copyright Act. [104]

---

consolation to those who have long relied on loan-out corporations and who have therefore already put their termination rights at risk.

[99] Daniel Gould, *Time's Up: Copyright Termination, Work For Hire and the Recording Industry*, 31 COLUM. J.L. & ARTS 91, 114 (2007).

[100] Davis, *supra* note 72, at 116-17. Davis eschews a complete analysis on this point; we address it directly in greater detail in Part IV.A, *infra*. For his part, however, Davis is so confident of the survival of writers' copyright termination rights, even in the loan-out context, as to open his article with the statement, "It is probably not quite fraud, though it comes terribly close to it, when motion picture and television production companies convince their writers to part with the rights to their stories when they sign with the companies." *Id.* at 93.

[101] Martha Graham, 380 F.3d at 640 (ruling against Martha Graham's testamentary heir and rejecting arguments based on creative arts policy as "a matter of legislative choice for Congress in the future, not statutory interpretation for a court at present").

[102] To be clear, film and television writers who work on specific commission or assignment from hiring producers, or who are regularly employed members of a "writer's room" staff, would likely be writing on a work-for-hire basis whether or not they were employed via loan-out corporations. The issue addressed here is principally salient for writers, musicians, and other creative individuals who work independently on a "spec" basis, and who then sell their independently developed or created works.

[103] *See supra* Section II.A.; *See also* Gould, *supra* note 99, at 114 ("It is doubtful that Congress intended these artists to be denied their termination rights.").

[104] Donaldson Publ'g Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639, 643 (2d Cir. 1967) (preserving an author's copyright renewal rights, to be exercised by his heirs, by finding that the author was not an "employee" of his own closely-held corporation because the corporation did not exercise sufficient control over the author or pay him a regular salary).

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 18 of 32

3 Harv. J. of Sports & Ent. Law 55, *80

One could argue that the loss of termination rights occasioned by an artist's use of a loan-out corporation is a fair exchange for the benefits the loan-out corporation offers in terms of limited liability and beneficial tax treatment. Indeed, to the extent that one views the use of a loan-out corporation as a "legal fiction" or a "manipulation," an artist's loss of termination rights might be viewed as not merely a fair trade, but just punishment. Furthermore, because of their start-up and insurance costs, loan-out corporations are generally more prevalent among better-established talent. As a result, it may be argued that the fundamental policy rationale espoused by Congress in providing copyright termination rights -- protecting the rights and financial prospects of artists with little bargaining power who give up their work for sometimes minimal compensation -- applies with less salience to the artists facing this quandary.

Yet, except perhaps for the most wildly successful among them, talent who use loan-out corporations are almost inevitably beholden to powerful studios, networks, recording companies, or financiers. Moreover, Congress recognized that the unequal bargaining power burdening authors resulted not only from their status, but also from the inherent impossibility of determining a work's value until it has been exploited. [105] This concern remains equally salient to authors of all statures. And whatever one's view of the ethics or social desirability of loan-out corporations, it is clear that Congress never intended to allow for copyright termination rights to be subject to such trade-offs. Similarly, one cannot credibly assume that artists who have elected to form loan-out corporations (or their representatives) have ever been mindful of such an implicit exchange. Rather, as the legislative record demonstrates, the 1976 Copyright Act's copyright termination provisions represent a considered legislative judgment on creative arts policy. The [*81] broad use of loan-out corporations, and the legal intricacies involved therein, seem to specifically and powerfully undermined both that legislative judgment and the delicate balance between creative individuals and major corporate entities embodied in the Copyright Act. [106]

## IV. POTENTIAL WAYS TO RESCUE ARTISTS' TERMINATION RIGHTS IN THE LOAN-OUT CONTEXT

In light of the foregoing, it is apparent that artists' reliance on loan-out corporations jeopardizes their copyright termination rights by bringing their creations within the scope of the work-for-hire carve-out. The challenge, then, is to find a way to give effect to Congress's manifest intent to afford artists the benefit of these copyright termination rights, and thereby bridge the divide between industry practice and social policy.

*A. Reading Reality Into the Copyright Act: Preserving Termination Rights By Statutory Interpretation*

One way to try to preserve artists' termination rights without jeopardizing the other benefits that artists enjoy from loan-out corporations is to look to the language of the Copyright Act itself for a reading that would preserve such rights even in a loan-out-based work-for-hire situation. While such an approach is initially appealing, in fact, it seems difficult, if not impossible, to generate a plain language reading of the relevant provisions of the Copyright Act that would hold up to serious scrutiny.

As described in greater detail above, loan-out arrangements in the entertainment industry involve two basic contractual relationships: the first between an artist and his or her loan-out corporation, and the second between [*82] the loan-out corporation and a producer. [107] As a result, an artist's proprietary copyright interest in a work is

---

[105] H.R. REP. NO. 1476, at 124 (1976).

[106] This may also, in fact, be part of a broader trend toward curtailing copyright termination rights. Professors Peter S. Menell and David Nimmer have argued that recent decisions in the Second and Ninth Circuits interpreting the 1976 Copyright Act's statutory termination provisions have already "undermine[d] the provisions of the Copyright Act that guarantee the right of reversion to authors and statutorily designated successors" and that, in so doing, "they disrupt the overall statutory scheme, block authors' statutory successors from realizing their congressionally mandated interests, and cast clouds of uncertainty and confusion over the ownership of many valuable copyrights." Peter S. Menell & David Nimmer, *Pooh-Poohing Copyright Law's "Inalienable" Termination Rights*, 57 J. COPYRIGHT SOC'Y U.S.A. 799, 857 (2010). Menell and Nimmer call for legislative reform while offering a "comprehensive framework for restoring the integrity and clarity of the termination of transfer provisions." *Id.* at 799.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 19 of 32

3 Harv. J. of Sports & Ent. Law 55, *82

actually involved in two separate contractual movements, from the artist to his or her loan-out as a work for hire, [108] and from the loan-out to the producer via assignment. [109] It may be possible to salvage artists' copyright termination rights in the loan-out context by focusing on these transfers as independent acts. In effect, the argument is that, in determining the terminability of a copyright transfer, the court need only look *to the transfer being terminated.* By this reasoning, because the transfer from loan-out corporation to producer is the transfer at issue, it would be eligible for termination because it is not, itself, a work-for-hire arrangement, and any preceding work-for-hire arrangement is irrelevant.

The source of this argument is the very first sentence of Section 203(a) of the Copyright Act, which reads: "*In the case of any work other than a work made for hire,* the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright . . . is subject to termination. [110] The first clause of this provision can be arguably read to mean, effectively, "in the case of *any transfer of interest other than a work-for-hire arrangement.*" With this reading, to preserve his termination rights, an artist need only establish that the transfer of rights from the loan-out corporation to the producer was not a work-for-hire arrangement. In cases where the work at issue predated the agreement between loan-out and producer, this should be an easy showing to make.

This argument has obvious appeal. In the first place, it offers a four-corners reading of the plain language of the Copyright Act that preserves the legislative intent embodied in the Act's copyright termination provisions: protecting artists with limited bargaining power and foresight from copyright transfers that, in hindsight, turn out to be obviously undercompensated. [111] In addition to representing sound creative arts policy, this **[*83]** approach empowers courts to achieve socially desirable results without resorting to nebulous common law principles or a direct legislative fix-it job. [112]

It would not be unprecedented for a court to take a narrow view of the relevant transaction to achieve a result that preserves its understanding of Congress's intent. For example, in *Larry Spier, Inc. v. Bourne Co.,* the Second Circuit (reversing the district court) held that a songwriter's testamentary grant of renewal copyrights did not preclude the songwriter's family from terminating an earlier assignment of such renewal copyrights to a corporation under Section 304(c). [113] In so holding, the court reasoned that the legislative history of Section 304(c) demonstrated a legislative intent to specifically protect the rights of authors' widows and children, which partially justified the court's narrowed focus on the songwriter's original assignment of rights (i.e., the grant which the songwriter's heirs then sought to terminate) and its refusal to consider the songwriter's later testamentary grant. [114] To be sure, this case represents an imperfect analogy. As between the two grants by the songwriter, the court in

---

[107] *See supra* Section III.A.

[108] Although strictly speaking, this is not a *transfer* as such because, in a work-for-hire situation, the employer is deemed to be the legal author of the work, in practice, the contractual work-for-hire arrangement represents a transfer of the legal interest in the work.

[109] As previously noted, many producers include work-for-hire language in their agreements with the loan-out corporations as a "belt and suspenders" measure. *See supra* note 75 and accompanying text. However, the law is clear that contractual work-for-hire language is not sufficient to transform an assignment of *preexisting* work into a work made for hire.

[110] 17 U.S.C. § 203(a) (2006) (emphasis added).

[111] *See generally supra* Section II.A.

[112] *See infra* Part V.A.

[113] Larry Spier Inc. v. Bourne Co., 953 F.2d 774, 779-80 (2d Cir. 1992).

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 20 of 32

3 Harv. J. of Sports & Ent. Law 55, *83

*Larry Spier, Inc.* allowed termination of the first in time and ignored the potentially contrary implications of the second. In the loan-out context, however, a court would have to allow termination of the *second* grant in time and ignore the potentially contrary implications of the first. Nevertheless, it does demonstrate the dominant role played by legislative intent in judicial analysis of copyright termination rights, as well as the willingness of some courts to adopt a narrow focus to preserve that intent. [115]

Ultimately, however, this nuanced reading of the Copyright Act's statutory termination provisions is unlikely to prevail because, while it preserves the *general* legislative intent behind copyright termination, this *particular* reading of Section 203(a) actually seems contrary to the legislative record. The language of Section 304(c) -- the sister provision to Section 203(a) that governs pre-1978 copyright transfers -- is revealing. The analogous precatory language of Section 304(c) reads, "[i]n the case of *any copyright subsisting in either its first or renewal term on January 1, 1978, other than a  [\*84] copyright in a work made for hire*, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it . . . is subject to termination ." [116] The language of Section 304(c) is quite clear that the phrase, "in the case," refers to *copyrights* that are works-for-hire, *not* to *transfers* that are works for hire, as would be necessary to preserve termination rights in the loan-out context. Further, there is simply no indication that Congress intended copyright termination rights to function so differently under Section 203 (for post-1978 transfers) and Section 304(c) (for pre-1978 transfers). In light of the foregoing, a reading of Section 203 that is so plainly inconsistent with the clearer language of Section 304(c) seems dubious at best. [117]

Relying on such statutory interpretation to preserve termination rights would create another major logistical complication: assuming that copyright termination rights survive a loan-out based transaction, who or what entity would hold them? Because the grant being terminated is that from loan-out corporation to producer, and because under the work-for-hire doctrine the loan-out corporation is deemed the legal author of the work from inception, it stands to reason that the loan-out corporation (and not the artist personally) would therefore hold the termination rights. [118] Yet such a result is  [\*85]  clearly contrary to what is contemplated by the plain language of Sections

---

[114]  Id. at 779-80. The lower court, on the other hand, had justified its rejection of the author's family's termination rights as effectuating the apparent testamentary intent of the songwriter, who had made his mistress (together with his widow and children) one of the beneficiaries of his will. Larry Spier, Inc. v. Bourne Co., 750 F. Supp. 648, 651 (S.D.N.Y. 1990).

[115]  *See also infra* Part IV.B.1 (discussing Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639 (2d Cir. 1967)).

[116]  17 U.S.C. § 304(c) (2006) (emphasis added).

[117]  Of course, it could be argued that this discrepancy actually *supports* a reading of Section 203(a) that, contrary to the plain language of Section 304(c), preserves copyright termination rights, in that the variation in language between the two sections (which are otherwise largely identical) evidences an intent to produce divergent substantive results. *Cf.* Larry Spier, Inc. v. Bourne Co., 953 F.2d 774, 779 (2d Cir. 1992) ("Significantly, Section 203 and Section 304 are different provisions involving different rights. . . . Section 304(c) is designed to protect a new family property right that does not exist under Section 203, and references to the history of Section 203 therefore are inappropriate here."). However, there is a far less substantively significant explanation for the linguistic discrepancy between Sections 203(a) and 304(c): because Section 304(c) deals with termination rights for pre-1978 grants, it must address the status of common law copyrights (and grants thereof), which are not a factor for Section 203(a) in light of the 1976 Copyright Act's broad preemption of common law copyrights. *See*  17 U.S.C. §§ 301, 303(a). Section 304(c)'s more specific reference to "any copyright subsisting in either its first or renewal term," then, is more likely meant to inform the status of grants of common law copyright (which are not eligible for termination at all) than it is to indicate an intention that the work-for-hire limitation be construed differently for Section 203(a) vs. Section 304(c) terminations. 17 U.S.C. § 304(c); *See* Nimmer & Nimmer, *supra* note 36, § 11.02[A][1] (2006).

[118]  Of course, this quirk is also avoidable if the grant of rights from the artist to his loan-out corporation is itself terminable, which would have the effect of terminating all further grants of rights in the chain-of-title. However, because we conclude that any attempt to attack the work-for-hire status of loan-out corporation services is unlikely to succeed, *see infra* Part IV.B, it necessarily

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 21 of 32

3 Harv. J. of Sports & Ent. Law 55, *85

203 and 304(c), which demonstrates a clear congressional intent to limit termination rights to actual authors/natural persons and their families, and not corporate entities. [119] The only apparent way to reconcile this conflict would be to find that the loan-out corporation holds the copyright termination rights in a constructive trust for the natural author as beneficial owner. There is precedent for such judicial machination with respect to the Copyright Act. For example, courts have used judicially imposed constructive trusts to protect copyrighted works from inadvertently falling into the public domain as a result of the rigid and sometimes harsh rules on copyright notice, renewal, and indivisibility under the 1909 Act. [120] However, the fact that this interpretation of the Copyright Act would require such further judicial contortionism seems to weigh against its plausibility or viability.

In light of the foregoing, reading Section 203(a)'s provision, "[i]n the case of *any work other than a work made for hire*" to mean "in the case of *any transfer of interest other than a work-for-hire arrangement*" seems to be an obvious *post facto* manipulation of the statute's plain language. While it would offer a result that is both consistent with sound creative arts policy and with Congress's *general* intent in enacting the Copyright Act's termination provisions, this reading is ultimately too problematic to succeed.

**[*86]** *B. Unraveling the Legal Fiction: Attacking the Work-for-Hire Status of Loan-out Corporation Services*

Given that the language of the Copyright Act itself probably cannot be reasonably read to guarantee termination rights to artists creating works for hire on behalf of their own loan-out entities, alternative approaches are needed. One option is to try to determine whether the works created by these artists are truly works made for hire. As discussed above, [121] the titles or descriptions used by the parties, while often persuasive, are not determinative of the existence of an employment or other for-hire relationship. The question is whether, under either the 1909 or 1976 Acts, courts will disregard a loan-out entity specifically created to employ the artist, and nevertheless find that the artist is not an employee for hire.

1. Work-for-Hire Status of Loan-out Corporation Services Under the 1909 Act

Courts deciding the status of a work made prior to January 1, 1978 examine whether the work was created at the hiring party's "instance and expense." [122] This test is satisfied "when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out." [123]

---

follows that an artist would have no more success terminating his grant of rights to his loan-out corporation than he would terminating the grant of rights from the loan-out to the actual purchasing entity.

[119]  *See* 17 U.S.C. §§ 203(a), 304(c) (referencing "widow[s]" and "children," and giving extremely detailed statutory instructions regarding the inheritability of copyright termination rights among an author's descendants).

[120]  *See, e.g.*, Goodis v. United Artists Television, Inc., 425 F.2d 397, 399-403 (2d Cir. 1970) (where author has no apparent intention to donate work to public, publication of author's work in a magazine bearing a copyright notice in magazine's name did not inject work into public domain under 1909 Act because magazine held copyright registration in constructive trust for author as beneficial owner); Abend v. MCA, Inc., 863 F.2d 1465, 1469-70 (9th Cir. 1988) (same); Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 266, 267 (2d Cir. 1944) (under the 1909 Act, "if one of several authors took out the copyright in his own name upon a joint work, the copyright was valid, but the copyright owner held it upon a constructive trust for the other authors"). (citing Maurel v. Smith, 271 F. 211 (2d Cir. 1921)).

[121]  *See supra* Section II.C.1.

[122]  Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d 565, 567-68 (2d Cir. 1966).

[123]  Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 634-35 (2d Cir. 2004). *See also* Playboy Enters, Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995) (instance and expense test met "when the motivating factor in producing the work was the employer who induced the creation.") (quoting Siegel v. Nat'l Periodical Publ'ns, Inc., 508 F.2d 909, 914 (2d Cir. 1974)); Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 206 F.3d

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 22 of 32

3 Harv. J. of Sports & Ent. Law 55, *86

In applying the 1909 Act test, courts have taken a fairly liberal view of the degree to which a hiring party must be involved in the creation of a work, whether at the inducement or preparation stage. For example, in holding that certain of Martha Graham's choreographed dances were works made for hire, and were therefore owned by a non-profit corporation of which she was the artistic director, the Second Circuit counseled that:

 **[*87]**  [t]here is no need for the employer to be the precipitating force behind each work created by a salaried employee, acting within the scope of her regular employment. Many talented people, whether creative artists or leaders of major corporations, are expected by their employers to produce the sort of work for which they were hired, without any need for the employer to suggest any particular project.  124

Likewise, as other courts have noted, the hiring party's right to control or supervise the creator's work is one that need not actually be exercised in order to result in a work made for hire. 125

The *Martha Graham* court was willing to find the affiliated Martha Graham Center for Contemporary Dance the owner of her choreographed dances notwithstanding that she was, in fact, the motivating force in creating any given artistic work. The Center, however, was not a loan-out corporation, and did bear the hallmarks of a legitimate non-profit. For example, Graham herself was ultimately answerable to a separate and independent board of directors. 126

If there is any relationship that is capable of not yielding a work made for hire under the 1909 Act's "instance and expense" test, the typical loanout corporation would seem to be a good candidate. Notwithstanding the nominal right of the loan-out "employer" to direct the activities of its "employee," there is usually in reality no true employer at all -- nor supervising party, nor board of directors -- that has the ability to control the work of the "employee," let alone one that actually exercises this power.

There is some precedent for finding that works created by an artist-controlled entity are not "for hire" under the 1909 Copyright Act. In *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*,  127  the Second Circuit was called upon to determine whether the renewal copyright interests in songs written by Walter Donaldson were owned by his heirs or by a publishing company which bore Donaldson's name and of which he had been the president. The answer depended on whether the songs were works made for hire,  **[*88]**  which in turn hinged on whether Donaldson was an employee of the publishing company.  128

In arguing that Donaldson was an employee for hire, the publishing company's successor in interest pointed to language in his contract providing that Donaldson "shall have a drawing account against your royalties of $ 300. [sic] per week during the first six months of your employment."  129 The court, however, rejected the argument that this language evidenced the parties' intent that Donaldson would be an employee or that his drawing account was equivalent to a salary. The actions of the parties and the construction of the agreement instead demonstrated that

---

1322, 1326-27 (9th Cir. 2000) ("instance" test is shaped in part by the degree to which the "hiring party had the right to control or supervise the artist's work") (quoting Nimmer & Nimmer, *supra* note 36, § 5.03[B][1][a][i].

124  Martha Graham, 380 F.3d at 640-41.

125  *See, e.g.*, Epoch Producing Corp. v. Killiam Shows, Inc., 522 F.2d 737, 744 (2d Cir. 1975) (explaining that the hallmark of "an employment for hire" is whether the employer "*could have* exercised the requisite power to control or supervise [the creator]'s work") (emphasis added).

126  Martha Graham, 380 F.3d at 640.

127  375 F.2d 639 (2d Cir. 1967).

128  Under the 1909 Act, an employer for whom a copyrighted work is made for hire held renewal rights in the work. 1909 Act, at § 24; *see also* Donaldson, 375 F.2d at 641.

129  375 F.2d at 641 n.4.

Case 7:22-cr-00560-CS    Document 30-2    Filed 05/31/24    Page 23 of 32

3 Harv. J. of Sports & Ent. Law 55, *88

Donaldson was not an employee for hire. For example, Donaldson was free to engage in outside writing activities for independent income that he need not share with the corporation. Moreover, "[n]o power to control or supervise Donaldson's performance was reserved to the corporation or exercised by it." [130] The reference to "employment" in Donaldson's agreement was dismissed as a shorthand way of saying "the period during which you will be writing songs to which the corporation has certain rights and will have certain royalties coming to you from such songs." [131]

While not discussed by the Court, *Donaldson* could be seen as another example of an effort to interpret the language and circumstances of the parties' relationship in a manner that preserves congressional intent. [132] Had the court held that Donaldson were an employee for hire of the defendant music publishing company, the renewal rights in Donaldson's copyrighted works would have been held by the corporation. Donaldson's children would have been deprived of these rights, in contravention of congressional intent to confer the benefit of the renewal term on authors and their heirs. [133]

It would be risky to read too much into *Donaldson*, however. First, other than the rather oblique reference to "employee" contained in the agreement, there was no evidence that either Donaldson or the defendant music publishing company intended to enter into an employment relationship, and the employer did not have the right to direct and control the employee's work, which is a hallmark of such a relationship. The unstated **[*89]** suggestion was that, had the language of the contract and the parties' course of dealings more persuasively evidenced an employment relationship, this would have been upheld by the court, notwithstanding the heirs' loss of renewal rights. [134]

Indeed, the Second Circuit later noted in *Graham* that, even though Martha Graham was a self-motivator and likely would have choreographed her dances even if the Martha Graham Center of Contemporary Dance had never existed, this was beside the point: "Where an artist has entered into an explicit employment agreement to create works, works that she creates under that agreement cannot be exempted from the work-for-hire doctrine on speculation about what she would have accomplished if she had not been so employed." [135]

Given that artists are required to be employed by their loan-out corporations in order to obtain the favorable tax treatment for which those corporations are designed, [136] artists attempting to circumvent their loan-out corporations face a daunting tightrope to walk: they must convince a court that they are employees in the eyes of the IRS, but not in the eyes of the Copyright Act. This could be an extremely difficult task. Indeed, we are not aware of any reported decision under the 1909 Act in which an individual who expressly intended to be the employee of a

---

[130]   Id. at 642-43.

[131]   Id. at 642.

[132]   *See supra* Section II.A.

[133]   *See supra* notes 13-16 and accompanying text.

[134]   A later court of appeals distinguished *Donaldson*, finding that the creator of a book of menus was an employee for hire where the book was published at the insistence of defendant corporation and where the corporation had the right to direct and control plaintiff's work -- even though the corporation "delegated" its right of supervision to the employee itself and even though the "precise nature" of the parties' putative employment relationship was unclear. Murray v. Gelderman, 566 F.2d 1307, 1310-11 & n.6 (5th Cir. 1978).

[135]   Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 640 (2d Cir. 2004).

[136]   *See supra* Section III.A.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 24 of 32

3 Harv. J. of Sports & Ent. Law 55, *89

corporation was nevertheless able to convince a court that he was an independent contractor for the purpose of circumventing the work-for-hire doctrine.

2. Work-for-Hire Status of Loan-out Corporation Services Under the 1976 Act

As required by *CCNV v. Reid*, an analysis of whether an artist is an employee of his or her loan-out corporation under the 1976 Act will depend upon the application of common law agency principles, the most important of which are: (1) the corporation's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the **[*90]** tax treatment of the hired party; and (5) whether the corporation has the right to assign additional projects to the hired party. [137]

Although styled as an employer-employee relationship, the typical loan-out's employee is an employee in name only. While nominatively drawing a salary and benefits from the corporation, the loan-out company's employee will personally decide (often with the help of an agent or manager not separately or formally employed by the loan-out) which types of projects to create. There is usually no direction or guidance from an employer, because there is usually no true employer at all -- nor supervising party, nor board of directors -- that can exercise control over the "employee's" work.

Yet in order to achieve the tax benefits that the loan-out corporation is designed to accomplish, the contract between the artist and his loan-out corporation must give lip service to the corporation's ability to exercise control, however unrealistic this may be in practice. Indeed, as discussed above, the artist must demonstrate the existence of a genuine employment relationship with the loan-out corporation, in accordance with common law agency principles -- the same principles utilized by the *Reid* court in its work-forhire analysis -- in order for the loan-out arrangement to pass muster with the IRS. [138] Corporate lawyers would be advised to ensure that these principles are written into every contract.

Thus, a modern employment contract between an artist and his loanout company will usually be quite clear about the rights the company has vis-à-vis the artist and will give lip service to all of the important *Reid* factors. The contract will provide that the employee will be paid a fixed salary by the company (along with bonuses to be paid in the company's sole discretion), which will be subject to withholding taxes; that the employee will receive benefits, including vacation time, health insurance, pension and profit-sharing; and that the employee shall render such services as the company may reasonably require, and shall do so under the company's direction, supervision, and control. [139] As discussed above, the agreement may even confirm the parties' intention that all works performed by the artist on behalf of the company be considered works made for hire under the Copyright Act. [140] In other words, under the 1976 Copyright Act, an artist whose representatives craft a loan-out arrangement which is designed to withstand IRS scrutiny will, necessarily, create a loan-out arrangement which will **[*91]** compel a conclusion that the artist's works are works made for hire in favor of the loan-out corporation.

Ultimately, because of the unambiguous language of such agreements, artists wishing to avail themselves of statutory termination rights will be placed in the unenviable position of having to explain to a court that the contractual language did not represent the true state of affairs and was designed only to take advantage of otherwise unavailable favorable tax laws.

3. Conclusion: Challenges to the Work-for-Hire Status of Loan-out Corporation Services Will Be Difficult

---

[137] *See supra* Section II.C.2.

[138] *See supra* Section III.A.

[139] *See* Farber & Cross, *supra* note 94, Form 7-1.

[140] *See supra* Section III.C.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 25 of 32

3 Harv. J. of Sports & Ent. Law 55, *91

For artists wishing to retain both favorable tax treatment and statutory termination rights, the unfortunate truth is that the conditions that a loan-out must satisfy in order to withstand IRS scrutiny are the very factors that weigh in favor of an employment relationship for copyright purposes. Courts have *required* that a service provider be an employee of the loan-out corporation, and that the corporation have the right to direct or control the service provider in some meaningful sense.   [141] Cognizant of the suspicion with which these loan-out relationships are met by the taxing authorities, and wanting to stay one step ahead in their ongoing game of cat-and-mouse with the IRS, lawyers have taken to drafting agreements for artists that are designed to leave no question that the artist is employed by his loan-out corporation.   [142] The corporation is given the absolute right to direct and control the artist's professional activities, whether or not this right is actually exercised or could ever realistically be exercised. The other common law agency principles counseling in favor of an employment relationship are satisfied, if only nominally. And if the artist-employee later tries to distance himself from this contractual language, he risks revealing the loan-out as a sham, possibly subjecting himself to a host of adverse tax consequences and penalties.

In short, artists hoping to avoid the loss of statutory termination rights by piercing their own corporate veils face uncertain prospects of success, as well as a variety of unintended consequences which could very well outweigh the benefits of making such arguments.

### [*92]  V. BACK TO THE DRAWING BOARD: LEGISLATIVE REFORM AND INDUSTRY BEST PRACTICES

Given the general lack of awareness of the unintended impact of loan-out corporations on artists' copyright termination rights, and the continued widespread use of such corporations, the conflict explored in this article is likely to become more and more pervasive with time. As the discussion above makes clear, while there are arguments available to artists who wish to preserve their copyright termination rights notwithstanding their use of loan-out corporations. However, their odds of success are uncertain at best, and they are likely to be met with fierce resistance by industry players with strong vested interests in shielding themselves and their investments from the potentially costly nuisance of copyright termination. Consequently, having already looked backward to explore how to preserve the legislative intent embodied in the Copyright Act's termination provisions for those artists who have already inadvertently jeopardized their termination rights by using loan-out corporations, we must now look forward at how to mitigate this problem in the future.

*A. Potential Revisions to the Copyright Act*

Perhaps the most obvious solution is to simply return to the text of the Copyright Act itself, and amend the language of Sections 203 and 304(c) to ensure that an artist's use of a loan-out corporation does not destroy his or her termination rights.

This change could be effected by inserting a single, narrowly tailored parenthetical into the relevant provisions. Section 203(a), for example, would read as follows:

> In the case of any work other than a work made for hire (unless the legal author of such work made for hire is a corporation which is owned in whole or in majority part by the individual author of the work, in which case such individual author shall be deemed the legal author of the work for purposes of this subsection), the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions . . . .

Section 304(c) would be similarly amended by adding the same new parenthetical after the phrase "other than a copyright in a work made for hire."

This change is drafted as narrowly as possible under the circumstances, thereby avoiding the kind of unintentional disruptions to other contractual relationships or elements of the copyright law implicated by the broader  **[*93]**

---

[141]   *See supra* note 85 and accompanying text.

[142]   *See supra* notes 139-140 and accompanying text.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 26 of 32

3 Harv. J. of Sports & Ent. Law 55, *93

statutory interpretation explored in Section IV.A above. [143] The revision protects termination rights in cases where the "legal author" -- i.e., loan-out corporation serving as employer/commissioning entity -- is owned *in whole or in majority part* by the individual author of the work. This phraseology captures loan-out corporations in which the author, for tax, management, or personal reasons, shares ownership of his or her loan-out corporation with a family member or agent, manager, or other representative. Finally, because Sections 203 and 304(c) clearly contemplate that termination rights are to be held only by *natural persons* (artists) and their families/descendants, and not corporate entities, this revision expressly deems the individual author to be the legal author of the work for purposes of the Copyright Act's termination provisions. This ensures that the rescued termination rights vest in the artists themselves, rather than in their loan-out corporations.

The appeal of this approach is clear. An amendment to the Copyright Act's termination provisions that is addressed specifically to the role of loanout corporations in copyright-intensive industries would resolve the existing conflict with deliberative policymaking, rather than judicial wrangling. It would unambiguously reconcile legislative intent with industry realities, and provide a key legislative clarification and/or affirmation of national creative arts policy.

In the short-term, however, it would be unwise for artists and their representatives to rely on legislative change alone to come to their rescue. While performing artists have demonstrated some sway when acting cohesively **[*94]** as a policy-oriented interest group, [144] legislative reform is inevitably a trying, time-consuming, and compromise-filled proposition. It would surely be influenced, if not altogether stymied, by significant counter-lobbying efforts from powerful industry elements who would benefit immensely from exploiting the "loan-out loophole" in the copyright termination regime. Moreover, except for the major ground-up reform effort embodied in the 1976 Copyright Act and subsequent heavily lobbied-for amendments extending the term of copyright, Congress has seemed largely content to allow the courts to resolve the gaps and ambiguities of copyright law. [145] In this context, artists and their lawyers must take proactive steps to adopt new "best practices" that adapt to the copyright law as it is, rather than waiting indefinitely for the copyright law to become what they think it should be.

---

[143] A similar, but somewhat broader and more aggressive approach, would be to insert a slightly adapted version of the parenthetical suggested here directly into the definition of "work made for hire" in Section 101 of the Copyright Act, thereby altogether excluding works created under loan-out arrangements from work-for-hire status. This would have broader-reaching consequences for copyrights created under loan-out arrangements, such as altering the term of copyright protection and rendering such copyrights subject to greater so-called "moral rights" protections. There is some appeal to this approach, simply because the difference between works created by artists in their fully individual capacities vs. through loan-out corporations is no more compelling with respect to their treatment under these provisions of the Copyright Act than it is with respect to their treatment for termination purposes, nor is there any indication that Congress intended the use of loan-out corporations to affect the status of the subject copyrights with respect to term, moral rights, or otherwise. Nevertheless, in an effort to narrowly tailor our solution to the problem explored in this article, and to avoid any unintended externalities from taking a more expansive approach, we have foregone actually changing the definition of "work made for hire" here.

[144] In 1999, in response to intense lobbying from the record industry, and with little analysis or debate, Congress adopted a "technical amendment" that expressly added sound recordings to the list of specifically enumerated works eligible for work-for-hire status under the Copyright Act. The change was met with an immediate, highly public, and intensely disapproving reaction from artists, including well-known musicians like Don Henley and Sheryl Crow, and after convening a brief hearing, Congress quickly retroactively repealed the amendment. *See* LaFrance, *supra* note 66, at 375-90.

[145] For example, the major developments in copyright law meant to adapt to the Internet era of copyright exploitation and infringement have almost uniformly originated with the courts, rather than with Congress. *See, e.g.,* MGM Studios, Inc. v. Grokster, Ltd., 545 U.S. 913 (2005) (announcing new "inducement" theory of copyright liability for manufacturers of devices or services with both legitimate and copyright-infringing functions); Sony Corp. v. Universal City Studios, 464 U.S. 417 (1984) (longstanding case on equipment manufacturers' potential liability as contributory copyright infringers revised by the Supreme Court in *Grokster*); In re Aimster, 334 F.3d 643 (7th Cir. 2003) (Seventh Circuit's effort to grapple with digital age contributory copyright infringement case by adopting "willful blindness" theory of liability; superseded by Supreme Court in *Grokster*); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001) (landmark decision holding that Internet file-sharing service could be held liable on contributory and/or vicarious copyright infringement theories).

### B. Contractual Solutions to Legislative Problems

Pending such specifically tailored legislative intervention, there are nevertheless steps that savvy, issue-conscious lawyers may be able take to protect their clients' interests. While existing elements of tax and copyright law render these solutions imperfect in their own right, these simple steps would offer some progress in protecting and effectuating the apparent legislative **[*95]** intent of the Copyright Act's termination provisions in the loan-out context.

### 1. Alternative Organizational Forms

While the vast majority of artists rely on loan-out *corporations*, there are other organizational structures available which may allow artists to avoid putting their termination rights at risk. For example, Mary LaFrance has suggested that artists may loan out their services through Limited Liability Companies (or "LLCs") [146] in order to preserve their termination rights. [147] When rendering services for an LLC in which the artist is the managing member, the artist may work as an independent contractor rather than as an employee of the LLC. In so doing, the artist avoids converting his or her creative work into a work for hire for which the loan-out entity is the legal author, thereby preserving his or her termination rights.

It is not uncommon for artists to rely on different corporate forms for different purposes. For example, most American artists, athletes, and entertainers organize as C corporations. However, when an American actor works in Canada, Canadian tax law creates a risk of "double taxation" -- i.e., taxation of income received by the loan-out corporation and then again when the same income is distributed to the actor. [148] To compensate, American **[*96]** actors working in Canada often contract with employers directly or use separate S corporations for their Canadian services, and may bifurcate their employment agreements and compensation based on the geography of their various services on a single project. [149]

---

[146] Limited Liability Companies began entering into widespread use in the 1990s, in response to demand from small business owners for an organizational form that better met their needs. While the precise contours of the form vary from state to state, in general, LLCs are understood to combine four basic features: (1) limited liability (similar to corporations); (2) "pass-through" tax treatment (similar to partnerships); (3) chameleon management (i.e., the ability to choose between centralized and direct member-management); and (4) creditor protection. For a general primer on LLCs, *see, e.g.*, Robert R. Keatinge et al., *The Limited Liability Company: A Study of the Emerging Entity*, 47 BUS. LAW. 378 (1992); Larry E. Ribstein, *The Emergence of the Limited Liability Company*, 51 BUS. LAW. 1 (1995).

[147] *See* LaFrance, *supra* note 66, at 404 n.109.

[148] *See* Mark Jadd, Norman Bacal, & Kay Leung, *Performing in Canada: Taxation of Non-Resident Artists, Athletes, and Other Service Providers*, 56 CANADIAN TAX J. 589, 596 (2008) ("[T]he use of a loan-out company creates the possibility of double taxation. A loan-out company is generally not taxable in the United States (since its net income is generally nil); consequently, it cannot take advantage of any foreign tax credits in respect of taxes paid by it in Canada. Furthermore, since actors performing services in Canada through a loan-out company historically have not paid Canadian income tax (generally, only the source deductions in respect of payments to the loan-out company are remitted to the Canadian tax authorities), they have not been able to claim a tax credit against US tax on the salaries received from the loan-out company. This problem is obviated, when possible, by either using a US fiscally transparent entity (such as a qualified subchapter S corporation) as the loan-out company, or having the actor personally enter into the contract for the provision of Canadian services. The latter arrangement has sometimes resulted in an odd situation for Canadian productions, where rehearsal services in the United States or acting services outside Canada are provided by the actor through the loan-out company while Canadian acting services are provided by the actor personally, under separate contracts.").

[149] *Id.*

Converting to LLCs is, however, at best a deeply imperfect solution. While the LLC offers the artist substantially (but not completely) the same "limited liability" benefit as a loan-out corporation would, [150] the tax treatment of such companies makes them significantly less beneficial to entertainers who rely on their loan-out corporations primarily for their financial benefits (which, in turn, derive primarily from their tax-shielding properties). This is because LLCs, like partnerships, are subject to so-called "pass-through" tax treatment -- that is, the entity itself is not taxed, but the underlying members are taxed on the entity's income as it if it was their own. [151] Put another way, "For federal income tax purposes, the LLC is not a separate taxpaying entity and is not subject to tax at the entity level. Instead, the LLC's members report their respective distributive shares of LLC income, gain, loss, and deduction and credit on their individual federal income **[*97]** tax returns." [152] As a result, an artist who works through an LLC effectively has the same treatment as an artist working without any loan-out entity, losing out on the lower corporate tax rates and more aggressive cost deduction against income taxes that come with the traditional corporate form. Moreover, in California (where most major participants in the entertainment industry reside), LLCs with total annual California income in excess of $ 250,000 are subject to significantly higher annual statutory fees than traditional corporations would be. [153] In essence, then, trading a loanout corporation for an LLC means, in effect, preserving one's termination rights at the cost of less advantageous tax treatment and higher fees. It is not a tradeoff that every artist will be prepared to make.

2. Contractual Copyright Ownership Arrangements

An author utilizing a loan-out corporation may be able to eliminate or ameliorate some of the potentially draconian consequences discussed in this article through careful draftsmanship. Specifically, rather than (as is the common current practice) explicitly providing that the author's contributions to his or her loan-out employer are works made for hire, the author's agreement with his loan-out could instead provide that ownership of any copyrights is expressly reserved to the artist, but such copyrights are *assigned* to the loan-out. [154] The effect would be the same, in that the loan-out company would own the copyright in the work and could thereafter assign it to third parties. But the author would be able to subsequently terminate the initial assignment (thereby breaking the chain of transfers that followed, effectively terminating the assignment to the purchasing entity).

---

[150] Indeed, LaFrance has noted that the limited liability offered by LLCs actually potentially undermines the argument that limited liability offers an adequate nontax motivation for an entertainer's decision to render services through a C corporation, although the scope of that limited liability is comparatively incomplete. *See* LaFrance, *supra* note 76, at 923-24 n.150 ("The argument that pursuit of limited liability is an adequate nontax motivation for forming a personal service corporation might also be unpersuasive where the taxpayer has the option, under state law, of forming a limited liability company ('LLC'), which could enjoy limited liability without being classified as a corporation for federal income tax purposes. However, because it is uncertain whether an LLC enjoys limited liability with respect to its activities in jurisdictions that do not recognize its LLC status, many taxpayers still have a reason to prefer incorporation.").

[151] *See* Cohen, *supra* note 76, at 116-17 ("[T]he structures of a limited liability company ('LLC') . . . will not provide the desired tax benefit to an entertainer" because "'limited liability companies . . . are treated for tax purposes as conduits whose income and deductions pass through to the partners or members as they are realized, with the various items retaining their original character in the process.'") (quoting STEPHEN A. LIND ET AL., FUNDAMENTALS OF CORPORATE TAXATION 703 (4th ed. 1997)).

[152] CONTINUING EDUCATION OF THE BAR OF CALIFORNIA, FORMING AND OPERATING CALIFORNIA LIMITED LIABILITY COMPANIES § 5.7 (2d ed. 2009).

[153] *Compare id.* at § 5.5 (statutory fees ranging from $ 900 to $ 11,790 depending on annual income), *with* CAL. REV. & TAX CODE § 23153 (West 2011) (no minimum franchise tax in a corporation's first year, $ 500 in the corporation's second year, and $ 800 per year thereafter).

[154] As discussed in Part IV.B.2, *supra*, the same common law agency principles that determine the capacity of loan-out corporations to withstand IRS scrutiny form the basis of the "employment" test used to determine work-for-hire status under the 1976 Copyright Act. Consequently, it is not enough to simply eliminate the explicit "work-for-hire" language from a loan-out employment agreement, as the default presumption under the law is nevertheless that any works created in the course and scope of an artist's employment are deemed works made for hire as a matter of law.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 29 of 32

3 Harv. J. of Sports & Ent. Law 55, *97

In principle, the 1909 and 1976 Copyright Acts both permit this type of contractual deviation from the default presumptions of copyright ownership **[*98]** that apply in employer-employee relationships. An employer and employee can prospectively agree, for example, that the copyright in all works prepared by the employee during the course of the employment relationship belong to the employee instead of the employer. [155] As the Second Circuit held in *Eisenberg v. Advance Relocation Storage, Inc.*: [156]

> By contract, a worker and a firm may agree that the worker will or will not have intellectual property rights to items that she makes while working for the firm. Such agreements are controlling regardless of whether, in their absence, a worker would be characterized as an employee or an independent contractor. Indeed, in copyright work-for-hire cases, the question of whether a worker is an employee or an independent contractor arises only after the court has determined that the parties did not agree on the allocation of intellectual property rights . . . . [A] worker and a firm can enter into a contract that explicitly delineates who holds intellectual property rights to worker-created items.

Nevertheless, such an agreement may only serve to vest the artist with *ownership* of the copyrighted work, and not *legal authorship* of such work -- and, as discussed above, the availability of statutory termination rights depends on the latter rather than the former. [157] Specifically, if the loan-out employer is deemed the "author" of a work created in the course and scope of an artist's employ, such work may not be terminable even if the employer and employee agree that copyright ownership will vest in the employee.

 **[*99]** Where an employer and employee (or, under the appropriate circumstances under the 1909 Act, an independent contractor [158]) agree that the copyright in a work created by an employee will be owned by that employee, the cases interpreting the 1909 and 1976 Acts are, at best, ambiguous as to whether such a work should be considered "for hire" from inception. If such a work *is* "for hire" from inception, later transfers for that work are not subject to termination, even if the parties agree that the copyright in the work would initially be owned by the employee. As disputes regarding works for hire (and agreements contradicting the presumption of the work for hire doctrine) have principally concerned themselves with ownership and control, and not with questions of authorship (as distinct from ownership) and/or the often-distant prospects of statutory termination, we are not aware of any case which confronts this issue directly. On the one hand, certain courts and commentators have reasoned that the "works for hire" doctrine "is based on the presumed mutual intent of the parties, and does not operate as a matter of law." [159] On the other hand, the Second Circuit's decision and rationale in *Marvel Characters* suggests that a "work

---

[155]  *See, e.g.*, Welles v. Columbia Broad. Sys., Inc., 308 F.2d 810 (9th Cir. 1962); May v. Morganelli-Heumann & Assocs., 618 F.2d 1363 (9th Cir. 1980). Indeed, under the 1909 Act, employers and employees could enter into even more particular agreements governing copyright ownership -- for instance, by agreeing that the copyright in all works prepared by the employee during the course of the employment relationship (whether or not within the scope of employment) belonged to the employer. *See* NIMMER & NIMMER, *supra* note 36, § 5.03 [B][1][b][i], at 5-33 ("The parties may expressly agree that the employee shall be deemed to own the copyright in all works produced in the employment relationship. Likewise, the parties may expressly agree that all works produced by the employee during the period of the employment relationship shall belong entirely to the employer."). This result, however, would not obtain under the 1976 Act, under which a work prepared by an employee must be prepared within the "scope of his or her employment" to be considered a work for hire, unless the work falls within one of the specifically enumerated categories of specially commissioned works and the parties sign a writing evidencing an intent that the work be created for hire. *See supra* Section II.C.2.

[156]  Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 116 (2d Cir. 2000). *See also* Iconix, Inc. v. Tokuda, 457 F. Supp. 2d 969, 994 (N.D. Cal. 2006).

[157]  *See supra* Section II.C.3.

[158]  Estate of Burne Hogarth v. Burroughs, 342 F.3d 149, 160, 163 (2d Cir. 2003) (holding that, as long as the "instance and expense" test was satisfied, there was no "distinction in the case law under the 1909 Act between an employee and an independent contractor" because "'the purpose of the [1909 Act] is not to be frustrated by conceptualistic formulations of the employment [sic] relationship.'") (citing Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1217 (2d Cir. 1972)).

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 30 of 32

3 Harv. J. of Sports & Ent. Law 55, *99

for hire" exists in such a state from inception, regardless of any agreement or characterization made by the parties -- essentially, that such a work is, by its very existential and unalterable nature, a "work for hire." [160] This interpretation finds support in Section 201(b) of the 1976 Act, which states:

> In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright. [161]

**[*100]** This language, including the use of the conjunction "and" to separate two evidently disparate statements, implies a separation between the concepts of copyright *ownership* and copyright *authorship* and suggests that parties may contract only around default rules of the former, not the latter.

If an employee and employer are not permitted to legally agree that a work created in the course and scope of employment is authored (as opposed to owned) by the employee, they will need to employ even more idiosyncratic contractual devices to preserve termination rights. For example, the employment agreement between an artist and his loan-out could specify that the creation of copyrighted works is expressly outside the scope of the artist's employment, and therefore would not be deemed "authored" by the loan-out employer. However, such a loan-out arrangement would likely be viewed with intense skepticism by the taxing authorities when, as in the case of a professional writer, the artist's entire career normally involves the creation of copyrighted works. [162] Indeed, if such an artist does *not* transfer ownership of his copyrighted works to the loan-out, it is difficult to express what service the artist actually renders, or benefit the artist actually provides, to justify the salary that artist draws from his or her so-called "employer." [163]

### 3. Contractual Reservation of Termination Rights

Finally, an artist who wishes to make a last-ditch attempt to preserve his or her termination rights might simply seek to do so via express contractual reservation, either as between the artist and his or her loan-out corporation, or as between the loan-out corporation and the purchaser. In practice, however, this too is unlikely to resolve the issue in artists' favor.

In the first place, the notion of "contractual reservation of statutory termination rights" is a non sequitur in this context. Termination rights are created -- or not created -- by the terms of Copyright Act. [164] If a work **[*101]** created and sold via a loan-out corporation is a work for hire from inception, copyright termination rights are simply

---

[159]   May, 618 F.2d at 1368-69 ("[I]n practice there was no question but that an employer and employee might agree, and often did agree that the rights under the copyright would remain in the employee (without any requirement of an assignment by employer to employee) subject to a right of the employer to be exclusively licensed to use the work in particular media. The provision of former Sec. 26 . . . must be read as creating a presumption of copyright in the employer which may be rebutted only by a preponderance of evidence of a contrary agreement as between the parties.") (quoting NIMMER & NIMMER, *supra* note 36, § 5.03(D)).

[160]   *See supra* Section II.C.1.

[161]   17 U.S.C. § 201(b) (2006).

[162]   *See supra* Sections III.A-III.B.

[163]   Nor does this concern vanish if the artist prevails in the legal argument that the contractual reservation of copyright between employee and employer affects authorship as well as ownership. The rather byzantine structure that would arise out of such an arrangement -- by which the artist effectively transfers copyright ownership from the loan-out to him or herself (by contradicting the legal presumption of work-for-hire status) but immediately assigns the same copyright back to the loan-out -- seems likely, in its own right, to draw the scrutiny and ire of already wary tax authorities.

[164]   17 U.S.C. § 304 (2006). *See also* Penguin Group (USA) Inc. v. Steinbeck, 537 F.3d 193, 202-04 (2d Cir. 2008) (discussing provisions of the Copyright Act which explicitly contemplate both the creation and the loss of statutory termination rights).

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 31 of 32

3 Harv. J. of Sports & Ent. Law 55, *101

never created, and therefore, there is nothing to reserve. Consequently, an artist cannot actually "save" his or her statutory termination rights by contractual reservation, but can only hope to create contractual termination rights which (presumably) would operate on the same terms.

Moreover, any enterprising attorney who includes such a provision in an agreement between a client's loan-out and purchasing entity is unlikely to get very far. The business realities of the entertainment industry are such that, in all but the most extreme and unique cases, producers and other buyers extract for themselves maximum rights with minimum limitations. [165] Indeed, it was the tendency of the industry to, virtually monolithically, make such all-encompassing demands that compelled Congress to make statutory termination rights (unlike copyright renewal terms under the 1909 Act) inalienable by contract or otherwise. [166] It is, in short, virtually impossible to imagine that producers would actually accept any effort by artists or their lawyers to create for themselves contractual termination rights to replace their undermined statutory rights.

Nor can artists avoid the resistance of buyers by burying contractual termination provisions in their agreements with their own loan-out corporations (which are typically not directly scrutinized by producers or other purchasing entities). In practice, any customary option or sale of intellectual property rights inevitably requires the seller to make a variety of representations and warranties, including that the seller has the rights it purports to grant, that those rights are unencumbered, and that the seller has not done and will not do anything to undermine the grant of rights to the purchasing entity. Where the seller is a loan-out corporation, these representations and warranties are typically subject to a personal guarantee by the artist himself. Any effort by an artist to terminate the rights of a producer by exercising contractual termination rights stealthily incorporated into the employment agreement between the artist and his or her own loan-out corporation will **[*102]** be inevitably and promptly met with a lawsuit from the producer for breach of those representations and warranties. Further, the damages suffered by the producer as a result of such a breach will be precisely the value of the work reclaimed by the terminating artist.

## VI. CONCLUSION

The complex and surprising interaction between the 1976 Copyright Act's copyright termination provisions, on the one hand, and the widespread use of loan-out corporations, on the other hand, is a ticking time bomb for copyright-intensive industries whose timer is about to hit zero. Although, as explained in this article, there is a dearth of legal authority on many of the key issues in this arena, as more and more copyright termination notices are issued under the 1976 Act in the years to come, that vacuum is unlikely to remain in place. Yet the conflict between copyright termination rights and loan-out corporations is not simply an academic question -- rather, it is a reminder that, where social policy and business reality intersect, legal abstractions can collide head-on with very real rights. Ultimately, while creative lawyers have a number of arguments available to them in hopes of avoiding the draconian unintended consequences of their longstanding advocacy of loan-out corporations, it is clear that only disciplined, targeted reform will suffice to truly reconcile the practices of the modern entertainment industry with the policies enshrined in the Copyright Act. In short, a legislative solution is the most straightforward and practical method of ensuring that termination rights are not inadvertently lost, while at the same time recognizing the legitimate expectations of the parties to true work-for-hire relationships, to whom these termination rights were never intended to apply.

Harvard Journal of Sports and Entertainment Law
Copyright © 2012 Harvard Journal of Sports and Entertainment Law. All Rights Reserved

---

[165] For instance, an option or sale of motion picture and television rights in an existing property, such as a novel, is typically drafted not as an assignment of solely those motion picture/television rights (as well as customary allied and ancillary rights), but rather, as an assignment of the *entire* copyright interest and all underlying rights, subject only to the reservation of certain specifically enumerated categories of rights (such as publishing, author-written sequels, and, in some cases, rights in stage or other media).

[166] *See supra* Section II.A.

Case 7:22-cr-00560-CS   Document 30-2   Filed 05/31/24   Page 32 of 32

3 Harv. J. of Sports & Ent. Law 55, *102

Harvard Journal of Sports and Entertainment Law

**End of Document**