# Exhibit 3

# Entertainment Audit Technique Guide

**Publication Date** - October 9, 2015

**NOTE:** This guide is current through the publication date. Since changes may have occurred after the publication date that would affect the accuracy of this document, no guarantees are made concerning the technical accuracy after the publication date.

If the taxpayer is an employee, he or she must work full-time for at least 39 weeks during the first 12 months after arriving in the general area of the new job location. The taxpayer does not have to work for the same employer for the 39 weeks. However, the taxpayer must work full-time within the same general commuting area. The 39 weeks do not have to be consecutive.

Only those weeks during which the taxpayer is a full-time employee or during which he performs services as a self-employed individual on a full-time basis qualify as a week of work. Treas. Reg. § 1.217-2(c)(iv). Section (a) of the regulation deals with employees and (b) deals with self-employed. Under either scenario, the definition of full-time is determined based on the practices of the industry at the time and place.

Treas. Reg. § 1.217-2(c)(4)(iv)(a) provides:

> Whether an employee is a full-time employee during any particular week depends upon the customary practices of the occupation in the geographic area in which the taxpayer works. Where employment is on a seasonal basis, weeks occurring in the off-season when no work is required or available may be counted as weeks of full-time employment only if the employee's contract or agreement of employment covers the off season period and such period is less than 6 months.

For example, a taxpayer who does voiceover work is considered full-time at 4 hours per day. Actors tend to not meet the 39 week test because their move deals with a short term job, or jobs, or the hope of finding a job. Time between jobs is not counted as part of the 39 weeks, unless it is part of a scheduled break in production and the taxpayer's contract includes continuous employment before and after the break. Only if a hiatus is included per contract, will it be included as part of the required 39 weeks.

For self-employed individuals, the regulation provides that where a trade or business is seasonal, weeks occurring during the off-season when no work is required or available may be counted as weeks of performance of services on a full-time basis only if the off-season is less than 6 months and the taxpayer performs services on a full-time basis before and after the off season. Actors looking for work would not constitute an "off-season". The performers would work full time if the work were available.

A move to another region that meets the distance test for greener pastures does not qualify unless the time test is met. There is no exception for actors or other entertainment related professions who were looking for work, but did not find it.

## Personal Service Companies and Personal Holding Companies

Many entertainers form corporations known as "loan-outs". The purpose of the "loan-out" is to loan out the services of its (usually 100%) shareholder. These corporations are often personal holding companies (PHCs) and in the case of actors are also personal service companies (PSCs). PSC is a C corporation that is taxed at a higher single rate and does not have a progressive tax rate. In a "loan-out" company if the contract specifically names the shareholder as the one to perform the job, it is considered to be PHC income (refer to I.R.C. § 542 etc). PHCs can be

"loan-outs" for actors, writers, directors, producers, etc. PSC as it relates to the entertainment industry is for people who are in front of the camera. PHCs pay additional Personal Holding Company Tax. In the entertainment industry, PSC and PHC companies usually will not have excessive compensation issues. The purpose of the tax rate is to encourage these PSCs and PHCs to pay wages, usually to the shareholders, in order to have zero taxable income on the corporate returns.

# Chapter 10 - Music Business

## Overview

The next section of this Entertainment Audit Technique Guide will give the examiner an overview of the music industry. It generally will show:

- How the industry is structured.
- What is involved in making and marketing a record, tape, or compact disk.
- How income is generated by artists and their operations.
- Books and records that should be available in each industry segment.
- Common industry terminology.
- Accounting practices used in the industry versus proper tax treatment of various issues.
- Suggested audit techniques regarding specific issues or accounts.

This audit technique guide is a general overview of the industry; it is not all-inclusive. Examiners should exercise their own initiative, consistent with applicable statutes, regulations, administrative pronouncements, and case law. No interpretation of the law discussed in this audit technique guide is to be cited as authority to taxpayers or used in the disposition of any case. Interpretation of the law should be made by the individual examiner working the case.

Guidelines reflected in this audit technique guide do not alter any existing technical or procedural instructions contained in the Internal Revenue Manual (IRM). If there are inconsistencies between these guidelines and the IRM, the IRM should be followed.

This section of the audit technique guide contains information on the following segments of the music industry:

- Songwriters
- Publishers
- Performers
- Record producers
- Managers
- Videos

Following is a list of issues not necessarily unique to the music industry but probably would not be found in other industries.